Court of Appeals No. 12-55705

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

MICKEY LEE DILTS, RAY RIOS, AND DONNY DUSHAJ, ON BEHALF
OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,
*Plaintiffs-Appellants*,

vs.

PENSKE LOGISTICS, LLC AND PENSKE TRUCK LEASING CO., L.P.
*Defendants-Appellees*.
_____

On Appeal from the United States District Court
For the Southern District of California
Case No. 08CV0318 CAB (BLM)
_____

**APPELLEES' BRIEF**
_____

Adam C. Smedstad                    James H. Hanson
SCOPELITIS, GARVIN, LIGHT,          SCOPELITIS, GARVIN, LIGHT,
   HANSON & FEARY, P.C.                 HANSON & FEARY, P.C.
30 W. Monroe St., Suite 600         10 W. Market St., Suite 1500
Chicago, IL  60603                  Indianapolis, IN  46204
Tel.:  (312) 255-7200               Tel.:  (317) 637-1777
Fax:  (312) 422-1224                Fax:  (317) 687-2414

Counsel for Appellees Penske Logistics, LLC and Penske Truck Leasing, L.P.

November 9, 2012

## CORPORATE DISCLOSURE STATEMENT

Appellees, Penske Logistics, LLC and Penske Truck Leasing Co., L.P., pursuant to Fed. R. App. P. 26.1(a), submit the following statement of their corporate interests and affiliations as follows:

1. Neither Penske Logistics, LLC nor Penske Truck Leasing Co., L.P. is a publicly-held entity.

2. Penske Logistics, LLC is wholly-owned by Penske Truck Leasing Co., L.P., and Penske Truck Leasing Co., L.P. does not have a parent corporation.

3. General Electric Capital Corporation, a publicly-held corporation, indirectly owns 10 percent or more of an ownership interest in Penske Truck Leasing Co., L.P.

Respectfully submitted,

/s/ James H. Hanson
James H. Hanson

# TABLE OF CONTENTS

Corporate Disclosure Statement

Table of Contents ............................................................................... i

Table of Authorities ........................................................................ iii

I.     INTRODUCTION ...................................................................... 1

II.    JURISDICTIONAL STATEMENT ............................................ 4

III.   STATEMENT OF THE ISSUES ................................................ 4

IV.    STATEMENT OF THE CASE .................................................. 4

       A.     Appellants' Meal and Rest Break Claims ........................... 4

       B.     The Summary Judgment Proceedings Below ...................... 8

       C.     The District Court Decision ........................................... 11

V.     STATEMENT OF THE FACTS ............................................... 13

VI.    SUMMARY OF THE ARGUMENT ........................................ 16

VII.   ARGUMENT ........................................................................... 17

       A.     *Rowe*'s Marching Orders Rebut Appellants' Cramped
              Reading of the FAAAA .................................................. 17

              1.     *Rowe* Governs ...................................................... 18

              2.     FAAAA Preemption is Not Limited to "Economic"
                     Regulation ............................................................ 21

              3.     There Is No "Health and Safety" or "Police Powers"
                     Exception to FAAAA Preemption ........................... 23

              4.     The FAAAA's Target is "Patchwork" State
                     Regulation Interfering With Market-Based Decisions
                     on Motor Carrier Service, Routes, and Prices ............ 27

       B.     Under *Rowe*, the California Break Laws "Relate To" Motor
              Carrier Services and Routes, If Not To Prices Too ............... 30

              1.     The Break Laws Exercise Direct Regulatory Control
                     Over Service ......................................................... 30

              2.     The Break Laws Are Also Necessarily Linked to
                     Routes .................................................................. 36

3.      The Break Laws Are Not "Wage" Laws That Produce Only An Indirect "Trickle Down" Effect on Service or Routes ........................................................................................40

C.      The *Motor Vehicle* Safety Exception Does Not Apply .......................48

VIII.  CONCLUSION..............................................................................................52

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

## Cases

*A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239
(S.D.N.Y. 2004) ..................................................................23

*Aguiar v. California Sierra Express, Inc.*, 2012 WL 1593202
(E.D. Cal. May 4, 2012)........................................................19

*Air Transp. Ass'n of America v. City & Cnty. of San Francisco*,
266 F.3d 1064 (9th Cir. 2001) ............................... 44, 45, 46

*Air Transport Ass'n of America, Inc. v. Cuomo*, 520 F.3d 218
(1st Cir. 2008) ......................................................................25

*Altria Group, Inc. v. Good*, 555 U.S. 70 (2008) ....................................18

*American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995)........................ 22, 29, 32

*American Truck. Ass'ns v. City of Los Angeles*, 660 F.3d 384
(9th Cir. 2011) ("ATA II") ........................................... 45, 50

*American Trucking Ass'ns v. City of Los Angeles*, 559 F.3d
1046 (9th Cir. 2009) ("ATA I")................................... 13, 49, 52

*AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011) ...................................52

*Blackwell v. Sky West Airlines, Inc.*, 2008 WL 5103195 (S.D.
Cal. Dec. 3, 2008) ................................................................25

*Brinker Rest. Corp. v. Superior Court*, 273 P.3d 513 (Cal.
2012) ........................................................................... passim

*Brown v. United Air Lines, Inc.*, 656 F. Supp. 2d 244 (D. Mass.
2009) ............................................................................ 24, 25

*California Div. of Labor Standards Enforcement v. Dillingham
Construction, N.A.*, 519 U.S. 316 (1997)...................... 20, 46

*California Dump Truck Owners Ass'n v. Nichols*, 2012 WL
273162 (E.D. Cal. Jan. 30, 2012) ................................. 31, 48

*Californians for Safe & Competitive Dump Truck Trans. v.
Mendonca*, 152 F.3d 1184 (9th Cir. 1998), *cert. denied*, 526
U.S. 1060 (1999).................................................................44

*Campbell v. Vitran Express, Inc.*, 2012 WL 2317233 (C.D. Cal.
June 8, 2012), *appeal pending* ................................. 18, 32, 39

*Cardenas v. McLane Foodservices, Inc.*, 796 F. Supp. 2d 1246
(C.D. Cal. 2011) ............................................................ 43, 48, 51, 52

*Chamber of Commerce of the United States v. Whiting*, 131
S.Ct. 1968 (2011) ...................................................................... 26

*Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259 (9th Cir.
1998) ................................................................................. 23, 34

*Chavis Van & Storage of Myrtle Beach, Inc. v. United Van
Lines, LLC*, 2012 WL 47469 (E.D. Mo. Jan. 9, 2012) ........................ 23

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536
U.S. 424 (2002) ........................................................................ 49

*Cole v. CRST, Inc.*, 2012 WL 4479237 (C.D. Cal. Sept. 27,
2012) ............................................................................. passim

*Data Mfg., Inc. v. United Parcel Service, Inc.*, 557 F.3d 849
(8th Cir. 2009) ......................................................................... 22

*DeBuono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S.
806 (1997) .......................................................................... 20, 46

*Difiore v. American Airlines, Inc.*, 646 F.3d 81 (1st Cir. 2011),
*cert. denied*, 132 S.Ct. 761 (2011) ................................... 24, 25, 43, 44

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ............................. 14

*Esquivel v. Vistar Corp.*, 2012 WL 516094 (C.D. Cal. Feb. 8,
2012) ............................................................... 19, 33, 40, 42

*Fitz-Gerald v. SkyWest Airlines, Inc.*, 65 Cal. Rptr. 3d 913 (Cal.
Ct. App. 2007) ......................................................................... 48

*Gade v. Nat'l Solid Wastes Mgmt.*, 505 U.S. 88 (1992) ......................................... 24

*In re Korean Air Lines Co.*, 642 F.3d 685 (9th Cir. 2011) ............................ passim

*Joseph v. Jetblue Airways Corp.*, 2012 WL 1204070 (N.D.N.Y.
April 11, 2012) ........................................................................ 25

*Kirby v. Immoos Fire Protection, Inc.*, 274 P.3d 1160 (Cal.
2012) ............................................................... 8, 41, 42, 43

*Missing Link Jewelers, Inc. v. United Parcel Service, Inc.*, 2009
WL 5065682 (N.D. Ill. Dec. 16, 2009) ............................................ 23

*Mitchell v. US Airways, Inc.*, 2012 WL 2856108 (D. Mass. July
12, 2012) ............................................................................... 25

iv

*Morales v. Trans World Airlines*, 504 U.S. 374 (1992) ................................. passim

*Murphy v. Kenneth Cole Productions, Inc.*, 155 P.3d 284 (Cal. 2007) ........................................................................ 41, 42, 50

*National Fed'n of the Blind v. United Airlines, Inc.*, 2011 WL 1544524 (N.D. Cal. April 25, 2011) .................................... 25

*New Hampshire Motor Trans. Ass'n v. Rowe*, 448 F.3d 66 (1st Cir. 2006), *aff'd*, 552 U.S. 364 ............................................ 25

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995).......................... 20, 45, 46

*Rowe v. New Hampshire Motor Trans. Ass'n*, 552 U.S. 364 (2008) .................................................................... passim

*Samica Enters., LLC v. Mail Boxes Etc. USA, Inc.*, 637 F. Supp. 2d 712 (C.D. Cal. 2008)........................................ 23

*Schleicher v. Wendt*, 618 F.3d 679 (7th Cir. 2010) ................................. 14

*Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186 (3rd Cir. 1998) ........................................................... 23

*Tillison v. Gregoire*, 424 F.3d 1093 (9th Cir. 2005)....................... 39, 50

*Travers v. Jetblue Airways Corp.*, 2009 WL 2242391 (D. Mass. July 23, 2009)...................................................... 25, 28

*United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605 (7th Cir. 2000), *cert. denied*, 531 U.S. 1036 (2000) ............... 21

*United Parcel Serv., Inc. v. Flores-Galarza*, 385 F.3d 9 (1st Cir. 2004) ................................................................. 49

*Witty v. Delta Air Lines, Inc.*, 366 F.3d 380 (5th Cir. 2004) ................... 22

**Statutes and Regulations**

49 C.F.R. § 392.14 .................................................................. 38

49 C.F.R. § 395.1(c) ................................................................. 10

49 C.F.R. § 395.2 .................................................................... 35

49 C.F.R. § 395.3(a).............................................................. 10, 35

49 C.F.R. § 395.3(a)(3)(ii) .......................................................... 35

49 C.F.R. § 395.8 .................................................................... 10

49 C.F.R. § 397.69 .................................................................. 38

49 C.F.R. § 397.7 ...................................................................................38

49 C.F.R. §§ 395.1, *et seq.*...................................................................8

49 U.S.C. § 14501(c) ..............................................................................1

49 U.S.C. § 14501(c)(1) .......................................................... 4, 16, 17, 47

49 U.S.C. § 14501(c)(2) .........................................................................24

49 U.S.C. § 14501(c)(2)(A) .......................................................... passim

49 U.S.C. § 14501(c)(3) .........................................................................24

49 U.S.C. § 31141 ................................................................. 9, 10, 11, 47

49 U.S.C. § 31141(c)(4).........................................................................9

49 U.S.C. § 41713(b)(1) ........................................................................17

Cal Code Regs. tit. 8, §§ 11010-11170....................................................50

Cal. Code Regs. tit. 13, § 2485 ..............................................................38

Cal. Code Regs. tit. 8, § 11020 ..............................................................50

Cal. Code Regs. tit. 8, § 11090 ..............................................................5

Cal. Code Regs. tit. 8, §11030 ...............................................................50

Cal. Code Regs. tit. 8, §11040 ...............................................................50

Cal. Lab. Code § 226.7 .............................................................. passim

Cal. Lab. Code § 226.7(a) .......................................................................7

Cal. Lab. Code § 226.7(b).................................................................. 7, 41

Cal. Lab. Code § 512 ......................................................................... 4, 49

Cal. Lab. Code § 512(a) ................................................................. 5, 7, 39

Cal. Veh. Code § 21718(a) .....................................................................38

Cal. Veh. Code § 22500 .........................................................................38

Cal. Veh. Code § 22502 .........................................................................38

Cal. Veh. Code § 22505 .........................................................................38

Cal. Veh. Code § 22507.5 .......................................................................38

Cal. Veh. Code § 35701 .........................................................................38

**Other Authorities**

H.R. Conf. Rep. No. 103-677 (1994), reprinted in 1994
    U.S.C.C.A.N. 1715 ................................................................. 17, 26, 28

*Hours of Service of Drivers*, 76 Fed. Reg. 81134 (Dec. 27,
    2011), *petition for review pending, American Truck. Ass'ns
    v. Federal Motor Carrier Admin.*, No. 12-1092 (D.C. Cir.) .............................35

Industrial Welfare Commission Order No. 9-2001 Regulating
    Wages, Hours and Working Conditions in the Transportation
    Industry ("Wage Order No. 9") .................................................... passim

Notice, 73 Fed. Reg. 79204 (Dec. 24, 2008) ........................................ 9, 10, 47, 52

S.R. No. 95-631 (1978) ............................................................22

**Rules**

Circuit Rule 28-2.2.....................................................................4

Circuit Rule 28-2.7.....................................................................4

## I.    INTRODUCTION

The district court correctly decided California's meal and rest break laws, when enforced against trucking companies like Penske Logistics, LLC ("Penske"), are "related to" motor carrier service, routes, and prices and are not otherwise saved from preemption under the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C. § 14501(c).  Appellants' break law claims, therefore, are FAAAA-preempted.

The break laws, unlike the wage and employment discrimination laws considered in other cases, do not *first* impact the cost of labor and *then* only as a consequence of that cost produce a remote or tenuous "trickle down" effect on prices, service, or routes.  Rather, the break laws *first* exert control over motor carrier service (by dictating when *no* service may be performed) and *first* dictate motor carrier routes (by forcing trucks to select routes that will accommodate the required breaks *and* by forcing trucks *off* those routes at time intervals dictated by law).  In other words, the break laws directly *regulate* both service and routes.  The necessary result of *that regulation* on routes and services also impermissibly causes an effect on prices that is in any event unnecessary to a preemption finding.  The break laws, therefore, are just as FAAAA-preempted as the conduct-regulating laws struck down in *Rowe v. New Hampshire Motor Trans. Ass'n*, 552 U.S. 364 (2008), and, because they are not imposed as a safety regulation "with respect to

1

motor vehicles," 49 U.S.C. § 14501(c)(2)(A), they are no more saved from FAAAA preemption than the health and welfare laws the *Rowe* court found were not excepted from preemption either.

Appellants do not demonstrate otherwise. The Appellants' brief stitches together a quilt of ostensibly like-colored threads with redundant quotations about the traditional police-power significance of wage laws, the importance of Congressional intent, and an historical presumption against preemption, but Appellants' artfully-selected and conceptually inapposite words create a patchwork of contradictory arguments that never quite match up at the seams. Appellants insist that *taking* breaks is vital to worker safety, yet claim employers may "choose" *not* to provide breaks at all by absorbing the premium "wage" penalty as a cost of doing business or by securing their workers' agreement to waive off breaks altogether. The Appellants' brief invokes Justice Scalia as a textualist committed to a faithful reading of just what statutes say, then summons up legislative reports in disregard of his scorn for relying on legislative history to divine statutory intent, and *then* changes direction again to pure conjecture that Congress surely must have considered and rejected the preemption of wage laws never mentioned in the legislative record at all. And Appellants also attempt to magically transform the break laws into regulations specific to *motor vehicle* safety, despite their earlier acknowledgement, *in the same brief*, that the break laws

2

govern hundreds of industries – many of which employ workers who never sit behind the wheel of any motor vehicle.

Most significantly, Appellants recognize the decision in *Rowe* (as they must, but barely), yet disregard its principal holdings that (a) FAAAA preemption is not in any sense limited to so-called "economic" regulation, (b) there is no police-power "health and welfare" exception to the FAAAA's preemptive sweep, (c) a test of a challenged state law's consistency – or inconsistency – with federal regulation is not the preemption test Congress had in mind, and (d) what Congress *did* have in mind was an end to a "patchwork" of state laws interfering with market-based decisions on how and when motor carriers provide services, which routes they employ, and what prices they charge.  *Rowe*'s marching orders – all expressed without any mention of a presumption against preemption – are accordingly clear:  The decision below should be affirmed because the California break laws regulate motor carrier service and routes (if not, as a result, motor carrier prices too), because they are not saved by the FAAAA's narrow list of exceptions, and because their enforcement against motor carriers would lead to just the sort of "patchwork" of service- and route-affecting state laws the FAAAA proscribes.

## II.   JURISDICTIONAL STATEMENT

Penske agrees with the Appellants' Jurisdictional Statement pursuant to Circuit Rule 28-2.2.

## III.   STATEMENT OF THE ISSUES

Restated, the issues in this appeal are as follows:

A.   Did the district court correctly decide that, because the California meal and rest break laws are "related to a price, route, or service of any motor carrier," 49 U.S.C. § 14501(c)(1), their enforcement against Penske is preempted by the FAAAA?

B.   Did the district court also correctly decide the California meal and rest break laws are not saved from FAAAA preemption under 49 U.S.C. § 14501(c)(2)(A) because they do not exercise safety regulatory authority "with respect to motor vehicles?"

Pursuant to Circuit Rule 28-2.7, all applicable statutes are contained in Appellants' Statutory Appendix.

## IV.   STATEMENT OF THE CASE

### A.   Appellants' Meal and Rest Break Claims

On January 17, 2008, Appellants filed their state-court complaint claiming Penske was in violation of California's meal and rest break laws under Cal. Lab. Code §§ 226.7; 512 and Industrial Welfare Commission ("IWC") Order No. 9-2001 Regulating Wages, Hours and Working Conditions in the

4

Transportation Industry ("Wage Order No. 9").[1]  *Appellants' Record Excerpts* ("RE") at 169-171.  After removal, *RE* at 160, the district court certified five sub-classes of approximately 349 Penske drivers and appliance installers who had been assigned to Penske's California account with Whirlpool and asserted various meal or rest break claims based upon their shift lengths and when breaks allegedly were or were not taken.  *RE* at 65-66.  While insisting in their class certification request that Penske had the means and obligation to pre-schedule meal and rest breaks into its dispatch system, Appellants also acknowledged that scheduling duty-free uninterrupted meal periods into a driver's service schedule would have resulted in one or two less deliveries per day per driver.  *Appellee's Supplemental Record Excerpts* ("SRE") at 48 (lines 2-3); 50 (lines 25-28).

Appellants also insisted that, as an employer, Penske had "an affirmative obligation … to ensure meal periods are taken."  *SRE* at 49 (lines 16-17), but the California Supreme Court would late confirm their understanding of the meal break law was not correct.  Under Cal. Lab. Code § 512(a), backed up by Section 11 of Wage Order No. 9, "[a]n employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes" and likewise "may not employ an employee for

---

[1] The official codified version of Wage Order No. 9 is found at Cal. Code Regs. tit. 8, § 11090, and a slightly different version may be found at http://www.dir.ca.gov/iwc/wageorderindustries. htm.

5

a work period of more than 10 hours per day without providing … a second meal period of not less than 30 minutes."   As explained in *Brinker Rest. Corp. v. Superior Court*, 273 P.3d 513, 536 (Cal. 2012), this does not mean the employer is required to "police meal breaks" to "ensure" no work is performed.  What it *does* mean, however, is that employers must provide a first meal break "no later than the start of an employee's sixth hour of work" and a second "after no more than 10 hours of work," *id*. at 537-538, and, during those breaks, employers "must afford employees uninterrupted half-hour periods in which they are relieved of any duty or employer control and are free to come and go as they please."  *Id*. at 534.

Indeed, as *Brinker* further explains, "a meal period's duty-free nature [is] its defining characteristic."  *Id*. at 533.  Thus, the employer is required to "relieve[ ] its employees of all duty, relinquish[ ] control over their activities and permit[ ] them a reasonable opportunity to take an uninterrupted 30-minute break, and [it may] not impede or discourage them from doing so."  *Id*. at 537.

There are limited circumstances under which the duty-free requirement for a meal break may be waived.  Specifically, under Wage Order No. 9, § 11(C), an on-duty meal period is permitted "*only* when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to" -- and only then if the written agreement permits the employee to "revoke the agreement at *any* time."

6

(Emphasis supplied). In addition, the second meal break in a 12-hour-or-more work day is not waivable at all if the first meal break was waived. Cal. Lab. Code § 512(a).

The rest break requirements set by the IWC provide for no sort of waiver. Under Wage Order No. 9, § 12(A), violations of which are prohibited by Cal. Lab. Code § 226.7(a), employers must authorize and permit all employees to take rest breaks "at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof" unless the employee's total daily work time is less than three and one-half hours. In other words, employees are entitled to "10 minutes rest for shifts from three and one-half to six hours in length, 20 minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours, and so on." *Brinker*, 273 P.3d at 529. "[I]nsofar as practicable," rest breaks are to be taken "in the middle of each work period." Wage Order No. 9, § 12(A).

Against that backdrop, Appellants claimed they were entitled to recover "premium wages" for Penske's alleged break law violations. *RE* at 182. The "premium wage" penalty is provided for in Cal. Lab. Code § 226.7(b), which mandates that, for each work day in which an employer fails to provide a required 30-minute meal or 10-minute rest break, "the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation." As recently explained by the California Supreme Court in *Kirby v. Immoos Fire Prot.*,

*Inc.*, 274 P.3d 1160, 1168 (Cal. 2012), Appellants' claim under Cal. Lab. Code § 226.7 was "not an action brought for nonpayment of wages," but rather "an action brought for non-provision of meal or rest breaks," the "remedy" for which is the one additional hour of pay owed as damages for the meal or rest break violation.

### B.     The Summary Judgment Proceedings Below

On May 11, 2011, Penske filed its Motion for Partial Summary Judgment on Appellants' meal and rest break claims.  Penske sought summary judgment on two alternative bases, both of which posed Supremacy Clause challenges to enforcement of California's meal and rest break laws against motor carriers.  It argued first that the break laws are impliedly preempted by the Hours of Service ("HOS") Regulations enforced by the Federal Motor Carrier Safety Administration ("FMCSA") at 49 C.F.R. §§ 395.1, *et seq*., and second, that the break laws are expressly preempted by the FAAAA.  *SRE* at 5 (lines 8-17).

In support of its motion, Penske submitted factual evidence by way of declarations from two of its representatives.  *SRE* at 7; 34.  In response, Appellants moved to strike those declarations and posed various evidentiary objections, to which Penske responded.  *RE* at 208-209 (ECF Nos. 93 and 104).  The district court ultimately denied Appellants' objections as moot because the tendered declarations were unnecessary to its FAAAA preemption ruling.  *RE* at 16.

8

Appellants submitted no contrary evidence of their own and argued instead, consistent with the district court's conclusion, that the issue of FAAAA preemption was "a purely *legal issue* … not subject to the need for a fact-intensive inquiry." *SRE* at 2 (lines 9-12) (emphasis in original).[2]  Appellants did, however, seek and obtain the district court's judicial notice of an FMCSA decision rejecting an administrative "petition for preemption" earlier filed by Penske and other interested motor carriers pursuant to 49 U.S.C. § 31141.  *RE* at 7; 86.  *See Notice*, 73 Fed. Reg. 79204 (Dec. 24, 2008) (*RE* at 88).

In the FMCSA proceeding, the petitioning motor carriers sought to invoke 49 U.S.C. § 31141, which permits the FMCSA to examine a state law or regulation "on commercial motor vehicle safety" that is "additional to or more stringent" than the FMCSA's own regulations and authorizes the FMCSA to declare the state law provision unenforceable if it has no safety benefit, is incompatible with federal regulation, or would unreasonably burden interstate commerce.  49 U.S.C. § 31141(c)(4).  Petitioners asked the FMCSA to exercise such preemption authority over the California break laws due to their incompatibility with the FMCSA's less stringent HOS Regulations, which currently impose no break requirement and generally afford drivers 14 consecutive hours of time each day in

---

[2] The only factual dispute Appellants advanced was in connection with their argument that Penske's activities wholly within California did not qualify for FAAAA protection at all, *SRE* at 2-3, a contention later rejected by the district court, *RE* at 8-10, and not raised again on appeal.

which they may accumulate 11 hours of driving time before they must go off duty for 10.  49 C.F.R. § 395.3(a).[3]  Petitioners argued that California's break laws, by interrupting a driver's on-duty time for at least 1 hour and 30 minutes each day, interfered with the operational flexibility and safety concerns the HOS Regulations promote and thus were appropriately preempted pursuant to 49 U.S.C. § 31141.  73 Fed. Reg. at 79204 (*RE* at 91).

The FMCSA declined to entertain the petition, concluding it had *no jurisdiction* to afford the sought-after relief under 49 U.S.C. § 31141.  *Id*. at 79206 (*RE* at 92).  Recognizing its preemption authority is statutorily-limited to laws or regulations "on commercial motor vehicle safety," the FMCSA decided the California break laws did not meet "the threshold requirement for consideration" under 49 U.S.C. § 31141 because the break laws "cover far more than the trucking industry" and, applicable as they are to many non-transportation concerns throughout California, "are not even unique to transportation."  *Id*. at 79205-79206 (*RE* at 92).  And, while the petitioning carriers had hoped to persuade the FMCSA to entertain their request based upon the break laws' effect on commercial motor vehicle operations, the FMCSA found it could not do so because "nothing in the

---

[3] Drivers are required to record their hours of service each day on daily record-of-duty logs pursuant to 49 C.F.R. § 395.8.  An exception to this rule exists for drivers operating within a 100-mile radius of a normal work-reporting location to which they return each day who, subject to time records required to be kept by the motor carrier, are exempt from the log requirement if their workday is limited to 12 hours instead of 14.  49 C.F.R. § 395.1(c).

statutory language or legislative history of 49 U.S.C. § 31141 … would justify reading into" the statute such broad authority that could potentially challenge state tax or environmental laws far afield from the limited regulations "on commercial motor vehicle safety" the FMCSA is narrowly authorized to preempt. *Id.* at 79206 (*RE* at 92).

### C.    The District Court Decision

The district court, although of course not constrained by the jurisdictional "on commercial motor vehicle safety" limitation applicable to FMCSA preemption under 49 U.S.C. § 31141, also declined to entertain Penske's alternative argument that the HOS Regulations impliedly preempt California's inconsistent break laws. *RE* at 6 n.4.  Turning to Penske's FAAAA preemption argument, however, and after first recognizing the Supreme Court decision in *Rowe* governed its analysis, *RE* at 12, the court ruled the break laws are expressly FAAAA-preempted because they have "a significant effect on the routes of a motor carrier," they "substantively impact" and "restrict" motor carrier service "in a way that is binding," and their routes and service ramifications "all contribute to create a significant impact upon prices" as well.  *RE* at 14-15; 17; 19.

In its decision, the district court was persuaded by Penske's unassailable point that five stops for breaks at California-specified intervals during a 12-hour work day would necessarily force truck drivers to select routes that could

11

accommodate those breaks and exit the highway, necessarily *altering* their routes to locate appropriate stopping places that safely and lawfully accommodate their vehicles. *RE* at 14. The court also found, among other things, that "the length and timing of meal and rest breaks seems directly and significantly related to … the frequency and scheduling of transportation" – elements of "service" this Court has deemed encompassed by the FAAAA's preemptive scope. *RE* at 14-15. The district court was further convinced the break laws' "imposition of substantive standards upon a motor carrier's routes and services" would produce a significant effect upon prices too, but concluded Penske's price impact evidence was in any event unnecessary to a preemption finding because

> [t]he key … is that to allow California to insist exactly when and for exactly how long carriers provide breaks for their employees would allow other States to do the same, and to do so differently. "And to interpret the federal law to permit these, and similar, state requirements could easily lead to a patchwork of state service-determining laws, rules, and regulations." Thus, the Court finds state regulation of details significantly impacting the routes or services of the carrier's transportation itself preempted by the FAAA Act.

*RE* at 15-16 (quoting *Rowe*, 522 U.S. at 373).

Finally, after discarding the notion that the break laws are non-preempted wage laws that merely require employers to pay higher wages, *RE* at 17, the court also ruled the FAAAA's motor vehicle safety exception under 49 U.S.C. § 14501(c)(2)(A) does not apply. Acknowledging *Rowe*'s holding that no general public health exception to FAAAA preemption exists, *RE* at 19-20, the court found

12

the generally-applicable break laws were not connected to motor vehicle safety and explained the "broadly sweeping exception" suggested by Appellants could not be reconciled with the text and purpose of the FAAAA. *RE* at 20-21. "'Indeed, if too broad a scope were given to the concept of motor vehicle safety, the exception would swallow the preemption section itself or, at the very least, cut a very wide swath through it.'" *RE* at 19-20 (quoting *American Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1054 (9th Cir. 2009) ("ATA I")).

## V.    STATEMENT OF THE FACTS

It is undisputed that Penske provides warehouse, distribution, and inventory-management services to various business accounts throughout California, including the Whirlpool account Appellants and other class member employees served.  It is also undisputed Penske's workers included driver-installers who hold licenses to operate commercial motor vehicles (like Appellant Mickey Dilts) and installers (like Appellants Ray Rios and Donny Dushaj) who generally did not hold such licenses, but assisted in the unloading and installation of appliances Penske  trucks transported on Whirlpool's behalf.  There is also no dispute Penske expected its workers to take meal breaks and automatically deducted 30 minutes of work time to account for daily meal periods. *Appellants' Brief* at 15-16.  It is also true, of

course, that Appellants *claimed* they were discouraged from taking or forced to miss breaks to which they were allegedly entitled.[4]

In addition, while the district court found Penske's tendered evidence to be unnecessary to its preemption finding, its summary judgment ruling was informed by additional propositions that were also undisputed as either self-evident or in any event never contested by Appellants.

First, truck drivers cannot simply stop, pull over their rigs, and take an off-duty break at pre-appointed intervals wherever they might be. The district court recognized this unassailable point by acknowledging that, in order to be fully relieved of duty during a break, a truck driver operating a vehicle at the appointed break time is necessarily required to change his route to exit the highway and

---

[4] The Appellants' Brief, in an apparent attempt to portray Penske in the most negative light possible, goes on to quote from various findings made by the district court in its class certification order, suggesting such "facts" have been fully and finally adjudicated. *Appellants' Brief* at 16-17 (citing *RE* at 64). That is, of course, not the case given that class certification orders are inherently tentative in nature, and a district court making a class certification decision is required to examine the merits of an underlying claim "only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011); *see also Schleicher v. Wendt*, 618 F.3d 679, 684 (7th Cir. 2010) (a class certification order's "peek at the merits" is "limited to those aspects of the merits that affect the decisions essential under Rule 23"). Appellants' "facts" about Penske's break policies are in any event immaterial to the Court's decision in this appeal because the question presented is not whether Penske *complied* with the California break laws, but instead whether the FAAAA forbids California from *requiring* Penske to comply.

14

locate a stopping place that safely and lawfully accommodates his vehicle before the break can even begin. *RE* at 14.

Second, as the court also observed – and noted Appellants did not "contest" or "oppose" – the break laws inevitably "reduce driver flexibility, interfere with customer service," and "impact the types of roads [Penske's] drivers/installers may take and the amount of time it takes them to reach their destination." *RE* at 14-15.

Third, because the five breaks required by California law during the course of a 12-hour work day add up to off-duty time of at least 1 hour and 30 minutes (two 30-minute meal breaks and three 10-minute rest breaks), neither the district court nor Appellants could contest the fact that the break laws, "by virtue of simple mathematics," reduce a driver's productive work time and thus necessarily reduce the amount and level of service Penske can offer its customers without increasing its workforce and equipment. *RE* at 14.

Finally, the district court also noted Appellants' agreement that the break laws "impact the number of routes each driver/installer may go on each day" – an agreement consistent with Appellants' own observation that scheduling off-duty meal periods for drivers would require each of them to make one or two less deliveries per day. *RE* at 14-15; *SRE* at 50 (lines 25-28).

## VI.    SUMMARY OF THE ARGUMENT

This case is governed by the Supreme Court decision in *Rowe*, which disposes of all of Appellants' efforts to impose limitations upon FAAAA preemption that simply do not exist.  The questions here are not whether FAAAA preemption is limited to so-called "economic" regulation (it is not), whether there is a "police powers" exception to the FAAAA (there is not), or whether California's meal and rest break laws survive preemption due to a presumption against preemption or the break laws' alleged lack of "anticompetitive effect" (they do not).  Rather, the questions presented are whether the break laws, which command motor carriers like Penske to *stop* providing service and to *alter* their routes, are "related to a price, route or service of any motor carrier" within the meaning of 49 U.S.C. § 14501(c)(1), and, because they are so related, whether the break laws are saved from preemption as an exercise of safety regulatory authority "with respect to motor vehicles" under 49 U.S.C. § 14501(c)(2)(A), which they are not.  This Court should answer those questions just as the district court and now four additional reported decisions have answered them and conclude Appellants' break law claims are FAAAA-preempted.  The district court decision should be affirmed in all respects.

16

## VII.  ARGUMENT

### A.  *Rowe*'s Marching Orders Rebut Appellants' Cramped Reading of the FAAAA

Pursuant to the FAAAA, "a State … may not enact or enforce a law … related to a price, route or service of any motor carrier … with respect to the transportation of property."   49 U.S.C. § 14501(c)(1).   Congress enacted the FAAAA in 1994 to eliminate the "patchwork" of burdensome state regulations affecting the trucking industry and to achieve that goal purposefully incorporated the broad preemptive language of the earlier-enacted Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713(b)(1), as interpreted by the Supreme Court in *Morales v. Trans World Airlines*, 504 U.S. 374 (1992).  *See* H.R. Conf. Rep. No. 103-677 at 83; 86 (1994), reprinted in 1994 U.S.C.C.A.N. 1715 ("the conferees do not intend to alter the broad preemption interpretation adopted … in *Morales*"). Fourteen years later, *Rowe* confirmed that Congress should be taken at its word and held the ADA preemption principles established in *Morales* apply with equal force to FAAAA preemption too.  *Rowe*, 552 U.S. at 370-371.  *Rowe* accordingly governs this case, and thus, before turning more specifically to the California break laws' preempted impact on motor carrier service, routes, and prices, it is important to first highlight *Rowe*'s rebuttal to most everything Appellants have to say in their thematic attack on the breadth of the FAAAA.

17

### 1.    *Rowe* Governs

Juxtaposed against their tireless presumption-against-preemption refrain, Appellants wait until the twenty-third page of their brief to barely reference the Supreme Court decision in *Rowe* – a strategy understandable if for no other reason than *Rowe* makes no mention of the presumption against preemption at all.[5] But Appellants cannot hide from *Rowe* (or *Morales* before it) because, as the controlling authority on the FAAAA, *Rowe* did not impose any of the constrictions on FAAAA preemption that Appellants advance in this appeal. As a result, the district court and now four additional reported court decisions have correctly ruled that proper application of *Rowe's* analysis strikes a fatal blow to the California break laws under the FAAAA. *See Cole v. CRST, Inc.*, 2012 WL 4479237 (C.D. Cal. Sept. 27, 2012); *Campbell v. Vitran Express, Inc.*, 2012 WL 2317233 (C.D. Cal. June 8, 2012), *appeal pending*; *Aguiar v. California Sierra Express, Inc.*, 2012

---

[5] Indeed, the presumption's place in an express preemption case such as this one is hardly well settled in the minds of all members of the current Supreme Court. Writing for the four-member dissent in *Altria Group, Inc. v. Good*, 555 U.S. 70 (2008), Justice Thomas observes that since 1992 most Supreme Court decisions have refrained from invoking the presumption in the context of express preemption cases (citing *Rowe* as an example) and further notes that, when it *has* been invoked sporadically during that timeframe, the presumption tends to appear in *dicta* or produce "fractured" decisions from the Court.  *Id*. at 98-103 (Thomas, J., dissenting).  "At bottom, although the Court's treatment of the presumption against pre-emption has not been uniform, the Court's express pre-emption cases since [1992] have marked a retreat from reliance on it to distort the statutory text."  *Id*. at 101.  In other words, whatever its application, the presumption against preemption cannot alter Congress's express preemptive intent as reflected in the language of the statute.

WL 1593202 (E.D. Cal. May 4, 2012); *Esquivel v. Vistar Corp.*, 2012 WL 516094 (C.D. Cal. Feb. 8, 2012).

In *Rowe*, the Court was called upon to decide if the FAAAA preempted an otherwise commendable Maine law aimed at preventing tobacco sales to minors. Recognizing Congress "copied the language" of the ADA into the FAAAA and did so "fully aware" of the interpretation of that language in *Morales*, 552 U.S. at 370, the Court first settled any question as to whether the ADA preemption rules of *Morales* apply to FAAAA preemption. Quoting extensively from *Morales*, the unanimous Court confirmed

> (1) that "[s]tate enforcement actions *having a connection with, or reference to*" carrier "'rates, routes, or services' are pre-empted," (2) that such pre-emption may occur even if a state law's effect on rates, routes or services "is only indirect," (3) that, in respect to pre-emption, it makes no difference whether a state law is "consistent" or "inconsistent" with federal regulation, and (4) that pre-emption occurs at least where state laws have a "significant impact" related to Congress's deregulatory and pre-emption-related objectives.

*Id*. at 370-371 (emphasis in original; internal citations omitted).

The Court then turned to the Maine tobacco law in question, finding the recipient-age-verification requirements the law imposed upon motor carriers were certainly "related to" motor carrier service and thus preempted by the FAAAA. Its continued reliance upon *Morales* in reaching that conclusion is apparent from the Court's analogy drawn to the result in *Morales,* which struck down consumer-fraud statutes "related to" airline-fare advertisements under the ADA. Formulating

a conditional construct equally applicable here, the Court observed that, "[i]f federal law pre-empts state efforts to regulate, and consequently to affect the advertising *about* carrier rates and services at issue in *Morales*, it must pre-empt Maine's efforts to regulate carrier delivery services themselves."  *Id.* at 372 (emphasis in original).  The Maine tobacco law's direct "connection with" motor carrier services, therefore, could not survive the FAAAA, *id.* at 371, any more than the California break laws can survive here because, if Maine's efforts to demand a *type of service* is preempted, so too is California's effort to command when *no service* may be performed at all.

Much more can (and will) be said about the *Rowe* decision, but the threshold point is that Appellants' citations to ERISA cases decided before *Rowe* are all for naught.  Appellants rely heavily upon decisions like *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995), *California Div. of Labor Standards Enforcement v. Dillingham Construction, N.A.*, 519 U.S. 316 (1997), and *DeBuono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806 (1997), in which a divided Supreme Court has struggled to tighten the noose on ERISA's preemption of state laws "relating to" employee benefit plans.  But, just last year, *this* Court held that such cases tending to draw back on ERISA preemption have no place in ADA preemption analysis in light of the decision in *Rowe*.  Specifically, in *In re Korean Air Lines Co.*, 642 F.3d 685 (9th Cir. 2011),

20

this Court dismissed the same ERISA-case-based argument Appellants advance here as follows: "If the Supreme Court intended to narrow the scope of these [ADA and FAAAA] preemption provisions because of its ERISA decisions, it could have done so in *Rowe*, but it did not." *Id*. at 697.

The ruling in *Korean Air Lines* is equally applicable to the FAAAA case before the Court now. *Id*. ("'[o]ur marching orders are clear: follow decisions until the Supreme Court overrules them'") (quoting *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 608 (7th Cir. 2000), *cert. denied*, 531 U.S. 1036 (2000)). *Rowe* certainly could have borrowed from the Supreme Court's earlier-decided ERISA cases to apply a more narrow gloss to the FAAAA as Appellants propose, but it did not. Accordingly, it is *Rowe*'s application and illumination of the principles established in *Morales* (written by committed textualist Justice Scalia) that governs the breadth of FAAAA preemption and the outcome of this case.

### 2. FAAAA Preemption is Not Limited to "Economic" Regulation

*Rowe* could not be more explicit in rebuking Appellants' claim that California's break laws survive preemption because the FAAAA narrowly targets only "economic" or public utility-like regulation by the states. *Rowe* rejected just that very argument in striking down Maine's tobacco law, casting off the notion that "Congress' primary concern was … with state 'economic' regulation" and

decisively pointing out that Congress declined to insert the term "economic" into its operative language "despite having at one time considered doing so." 552 U.S. at 374 (citing S.R. No. 95-631, p. 171 (1978)). Truth be told, Maine's advocates should not have been surprised by such a dismissive ruling given the Court's previously-expressed view in *Morales* that limiting ADA preemption to laws "actually prescribing" rates, routes, or services or targeting only air carriers specifically would "simply read[ ] the words 'relating to' out of the statute" and create "an utterly irrational loophole." 504 U.S. at 385-386.

Indeed, neither the consumer-fraud statutes struck down in *Morales* nor the Maine tobacco law deemed preempted in *Rowe* had anything to do with the sort of "economic" regulation to which Appellants would limit the FAAAA's preemptive strike. It is hardly remarkable, therefore, that numerous cases have struck down as ADA- or FAAAA-preempted a wide variety of state laws having nothing to do with traditional public utility-like controls. *See American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995) (consumer fraud and deceptive business practices act claims ADA-preempted); *Korean Air Lines*, 642 F.3d 685 (California unfair competition law claim ADA-preempted); *Data Mfg., Inc. v. United Parcel Service, Inc.*, 557 F.3d 849 (8th Cir. 2009) (common law billing practice claims FAAAA-preempted); *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380 (5th Cir. 2004) (tort claim for deep leg thrombosis injury ADA-preempted); *Chavis Van & Storage of Myrtle*

*Beach, Inc. v. United Van Lines, LLC*, 2012 WL 47469 (E.D. Mo. Jan. 9, 2012) (common law fraud-related claims FAAAA-preempted); *Missing Link Jewelers, Inc. v. United Parcel Service, Inc.*, 2009 WL 5065682 (N.D. Ill. Dec. 16, 2009) (application of penalty-limiting statute FAAAA-preempted); *Samica Enters., LLC v. Mail Boxes Etc. USA, Inc.*, 637 F. Supp. 2d 712 (C.D. Cal. 2008) (implied covenant of good faith claim FAAAA-preempted); *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239 (S.D.N.Y. 2004) (trade secret and unfair competition claims ADA-preempted). Other pre-*Rowe* cases cited by Appellants, which otherwise decided claims completely different from those here, are effectively overruled by *Rowe* to the extent they suggest the sort of "economic" regulation constraint *Rowe* rejects.[6]

### 3. There Is No "Health and Safety" or "Police Powers" Exception to FAAAA Preemption

*Rowe* also teaches that, notwithstanding the importance of health and safety concerns, the "*reason why*" a state law is enacted is of no significance, in and of itself, to the FAAAA's "related to" preemption analysis – unless the type of law in question was *expressly* excepted by Congress in defining the FAAAA's terms. 552 U.S. at 373 (emphasis in original). *Rowe* thus readily disposes of Appellants'

---

[6] *See Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259 (9th Cir. 1998) (food-service related tort claim not ADA preempted); *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186 (3rd Cir. 1998) (defamation claim not ADA-preempted).

insistence that the California break laws are saved from preemption as a "health and safety," "police power," or "wage law" enactment. "Despite the importance of the public health objective" of Maine's tobacco law, the *Rowe* Court rejected any suggestion that the FAAAA leaves room for such "important purpose" exceptions, examined the narrow list of state laws Congress expressly *did* save from preemption in 49 U.S.C. §§ 14501(c)(2); (c)(3), and dismissed Maine's argument with the blunt and conclusive finding that "the list says nothing about public health." 552 U.S. at 374.[7]

There is likewise no "police power" or "wage law" exception set forth in 49 U.S.C. §§ 14501(c)(2); (c)(3) either. Post-*Rowe* cases like *Difiore v. American Airlines, Inc.*, 646 F.3d 81, 87 (1st Cir. 2011), *cert. denied*, 132 S.Ct. 761 (2011), thus rightly reject the sort of "police power" exception Appellants advance and acknowledge state interests, "[h]owever traditional the area," must give way to Congress's express preemptive strike if they are "related to" price, routes, or service as the FAAAA commands. *See also Brown v. United Air Lines, Inc.*, 656 F. Supp. 2d 244, 252 (D. Mass. 2009) ("*Rowe* stands for the proposition that courts should not imply broad exceptions to the preemption provision for areas of

---

[7] In this respect, *Rowe* is perfectly consistent with cases in which the Supreme Court has acknowledged that even the "'compelling interest'" states possess in the field of public health and safety is not so sacrosanct as Appellants suggest and must instead yield whenever paramount federal law demands. *See Gade v. Nat'l Solid Wastes Mgmt.*, 505 U.S. 88, 108 (1992) (state regulation of occupational health and safety issues preempted) (internal citations omitted).

traditional concern"). Indeed, as the lower court affirmed by *Rowe* persuasively explained, "[a]n exclusion from preemption for police-power enactments would surely 'swallow the rule of preemption,' as most state laws are enacted pursuant to this authority." *New Hampshire Motor Trans. Ass'n v. Rowe*, 448 F.3d 66, 76 (1st Cir. 2006), *aff'd*, 552 U.S. 364 (internal citations omitted). Thus, many post-*Rowe* authorities have struck down state "wage law" or other "police power" enactments as preempted at nearly every turn. *See, e.g., Difiore*, 646 F.3d 81 (wage claim under "tips law" prohibiting employer deductions from employee tips or service charges ADA-preempted); *Air Transport Ass'n of America, Inc. v. Cuomo*, 520 F.3d 218 (1st Cir. 2008) (passenger "bill of rights" law ADA-preempted); *Mitchell v. US Airways, Inc.*, 2012 WL 2856108 (D. Mass. July 12, 2012) (employee retaliation claims ADA-preempted); *Joseph v. Jetblue Airways Corp.*, 2012 WL 1204070 (N.D.N.Y. April 11, 2012) (deceptive practices and false imprisonment claims ADA-preempted); *Blackwell v. Sky West Airlines, Inc.*, 2008 WL 5103195 (S.D. Cal. Dec. 3, 2008) (California break law claim ADA-preempted).[8]

In the end, therefore, Appellants' speculation as to whether wage-and-hour law litigation "would have been fresh in the minds of…lawmakers" or whether

---

[8] *See also National Fed'n of the Blind v. United Airlines, Inc.*, 2011 WL 1544524 (N.D. Cal. April 25, 2011) (California disability law claim ADA-preempted); *Brown*, 656 F. Supp. 2d 244 ("tips law" wage claim ADA-preempted); *Travers v. Jetblue Airways Corp.*, 2009 WL 2242391 (D. Mass. July 23, 2009) ("tips law" wage claim ADA-preempted).

Congress might have contemplated a "police power" exception to FAAAA preemption is irrelevant; Congress adopted no such exceptions.[9]  *Rowe* teaches that one need only read the statute itself and, finding no "police power" exception stated in its saving clause, conclude that no such exception exists.  Appellants' effort to wrap the California break laws in their "police power" quilt is soundly rebutted by *Rowe*.[10]

---

[9] *See Appellants' Brief* at 33.

[10] Appellants' emphasis upon legislative history bears only brief mention for two reasons.  First, *Rowe* rejected the very sort of speculation Appellants offer here, finding no indication in the legislative record that "Congress made a firm judgment about, or even focused upon," the "public health" or "tobacco" exception Maine advanced.  552 U.S. at 374.  Likewise, Appellants cannot point to any mention of a "police power" or "wage law" exception anywhere in the legislative history, let alone in the FAAAA's statutory text.  Second, Appellants' tortured reading of a single befuddling sentence plucked from the legislative record proves the wisdom of the rule that Congress's "'authoritative statement is the statutory text, not the legislative history.'"  *Chamber of Commerce of the United States v. Whiting*, 131 S.Ct. 1968, 1980 (2011) (internal citation omitted).  Appellants twice note the House Conferees' muddled comment that the list of excepted state laws in the FAAAA's saving clause "is not intended to be all inclusive, but merely to specify some of the matters which are not 'prices, rates or services' and which are therefore not preempted."  They suggest such phrasing means there is some sort of a "gap" in the statutory text into which courts should fit judge-made exceptions for things Congress might never have intended to preempt.  *Appellants' Brief* at 13; 42 (citing H.R. Conf. Rep. No. 103-677 at 84).  The Conferees' comment says no such thing, of course, but it is also certainly *not* a model of clarity, thus illustrating the danger of guessing at legislative intent gleaned from a few confounding words written by the author of a legislative report – guesswork the *Rowe* Court wisely avoided when it refused to engage in statutory analysis "untethered from the text" of the FAAAA itself.  *Whiting*, 131 S.Ct. at 1980 n.6.  Suffice it to say also that *Rowe* found no need to consider President Clinton's FAAAA-signing remarks, *see Appellants' Brief* at 30-31, which are evidence of *neither* legislative history *nor* statutory analysis.

4.   **The FAAAA's Target is "Patchwork" State Regulation Interfering With Market-Based Decisions on Motor Carrier Service, Routes, and Prices**

As this Court recently confirmed, *Rowe* also disposes of Appellants' theory that the California break laws cannot be preempted because they allegedly have no "anticompetitive effect."[11]   The words of this Court ring just as true here as they did last year in *Korean Air Lines* when, in a similar vein, proponents of a price-fixing claim argued its promotion of competition saved it from an ADA preemption fate:

> It is *immaterial* that the state laws do not interfere with the purposes of the federal statute or that they might be consistent with promoting competition and deregulation.  The Supreme Court has rejected this argument.

642 F.3d at 697 (emphasis supplied) (citing *Rowe*, 552 U.S. at 370 ("it makes no difference whether a state law is 'consistent' or 'inconsistent' with federal regulation") and *Morales*, 504 U.S. at 386 (state and federal law consistency "is beside the point")); *see also Morales*, 504 U.S. at 386 ("[n]othing in [the ADA] suggests that its 'relating to' pre-emption is limited to *inconsistent* state regulation") (emphasis in original).  As shown below, Appellants in any event misunderstand the competition-related objectives Congress sought to promote in the ADA/FAAAA legislation.

---

[11] *Appellants Brief* at 31.

The issue is not, as Appellants frame it, whether one motor carrier competing for a customer would gain a "competitive advantage" over another if each plays by the same set of break rules California commands.[12]  The laws struck down in *Rowe* and *Morales*, both of which were equally applicable state-wide to all carriers alike, would have flunked that test too, and indeed, if Appellants' newly-fashioned "competitive advantage" test were the rule, the *only* state laws subject to preemption would be laws prescribing service, route, or price constraints on a selective carrier-by-carrier basis.  There is no authority for such a myopic view of Congress's purpose.  Rather, as Congress put it, the purpose was to ensure that all service, route, and pricing options each motor carrier offers its customers "will be dictated by the marketplace" – "not by an artificial regulatory structure" limiting or restricting those options.  H.R. Conf. Rep. No. 103-677 at 88.

In other words, when Congress passed the ADA "to end federal regulation of the airline industry and to encourage 'reliance on competitive market forces,'" its intent was "to prevent States from filling [the] regulatory void and using state law to interfere with 'market forces.'"  *Travers*, 2009 WL 2242391 at *2 (quoting *Morales*, 504 U.S. at 378).  Likewise, and as even better explained in *Rowe*, Congress's purpose under the FAAAA was to leave the trucking industry's service, route, and pricing decisions, "to the competitive marketplace," 552 U.S. at 364,

---

[12] *Appellants' Brief* at 31.

thus forbidding "a State's direct substitution of its own governmental commands for 'competitive market forces' in determining … the services that motor carriers will provide." *Id*. at 372. In short, "'agreements freely made, based on needs perceived by the contracting parties at the time,'" – i.e., market-driven choices, not state-law commands – should decide how and when motor carriers provide services, which routes they employ, and what prices they will charge. *Wolens*, 513 U.S. at 230 (agreeing with the United States as *amicus curiae* that enforcement of such agreements is essential to the stability and efficiency of the market and "key to sensible construction of the ADA").

Finally, of course, if one state is permitted to interfere with such choices, then other states would be permitted to do the same, leading "to a patchwork of state service-determining laws, rules, and regulations" completely inconsistent with Congress's goal for uniformly unregulated competition across the nation. *Rowe*, 552 U.S. at 373. As shown below, such a forbidden "patchwork" (a word Appellants conspicuously never mention) is just where California-like break laws lead because they dictate *when* motor carrier services may (and may not) be provided, *which* of the otherwise available routes motor carrier trucks may travel upon, and potentially *how* motor carrier prices are to be determined. The California break laws are therefore just the sort of laws the FAAAA proscribes.

29

**B.    Under *Rowe*, the California Break Laws "Relate To" Motor Carrier Services and Routes, If Not To Prices Too**

It is unsurprising that Appellants rest most of their case on a thematic attempt to portray the FAAAA as narrow in scope and devote so little effort to asking whether the California break laws actually "relate to" motor carrier service, routes, or prices. By requiring a duty-free 30-minute meal break "no later than the start of an employee's sixth hour of work," a second duty-free 30-minute meal break "after no more than 10 hours of work," and a 10-minute rest break every four hours throughout the work day, *Brinker*, 273 P.3d at 537-538, the California break laws plainly *do* so "relate" because they have just as much of a direct connection to motor carrier service as the tobacco law struck down in *Rowe* and an even more significant link to service than the airfare-advertising laws struck down in *Morales*. Furthermore, the break laws go even further by virtue of their direct link to motor carrier routes as well. The findings of the district court on those points (and the four additional courts that have since concurred) are irrefutable, and Appellants' characterization of the break laws as mere "wage laws" that only increase the cost of labor does not suggest otherwise.

**1.    The Break Laws Exercise Direct Regulatory Control Over Service**

Since *Morales*, it has been well established that, in preempting state laws "relating to" service, Congress did not mean only to forbid states from "actually

*prescribing*" service. 504 U.S. at 385 (such an interpretation "reads the words 'relating to' out of the statute") (emphasis supplied). Rather, it is more than enough for preemption if "the effect of the regulation is that carriers will have to offer … services that differ significantly from those that, in the absence of the regulation, the market might dictate." *Rowe*, 552 U.S. at 372. For at least four reasons, the California break laws have *exactly* that preempted service-determining effect.

First, by requiring employees to be fully-relieved of all duty and to *stop working* at specified intervals for set periods of time throughout the day, the break laws command that *no* service may be performed during those times. With respect to meal breaks specifically, the "duty-free nature" of the break is "its defining characteristic," requiring "uninterrupted half-hour periods" in which employees "are relieved of any duty or employer control and are free to come and go as they please." *Brinker*, 273 P.3d at 533-534. Dictating when *no* service may be provided (and when it may thereafter resume) is directly and substantively "connected to" service, thus making the break rules' preempted impact self-evident. *Cole*, 2012 WL 4479237 at *4 (the break laws "affect services by dictating when services may *not* be performed") (emphasis in original). *See also California Dump Truck Owners Ass'n v. Nichols*, 2012 WL 273162 at *8 (E.D. Cal. Jan. 30, 2012) (distinguishing an FAAAA-challenged environmental

regulation from the California break laws because the break laws "mandate[ ] that drivers *stop* at particular intervals throughout the day" and "[d]uring those intervals *no services* [can] be provided") (emphasis in original and supplied).

This first command of the break laws – the *forbidding* of service – is in and of itself sufficient to support the district court's FAAAA preemption finding. Although Appellants now insist the district court needed evidence to inform its ruling,[13] they were right in the first place when they said in the proceedings below that the FAAAA preemption question here was "a purely *legal* issue" with no "need for a fact-sensitive inquiry."[14] That the break laws stop service in its tracks is enough to end the legal inquiry because, as *Rowe* said, "[i]f federal law pre-empts state regulation of the details of … a program that primarily *promotes* carriage, it must pre-empt state regulation of the essential details … of the carriage itself." *Rowe*, 552 U.S. at 373 (emphasis in original) (citing *Wolens*, 513 U.S. at 226-228). Surely, *when* (and when *not*) to provide service is just as much an "essential detail" of motor carriage as the *type* of service Maine was FAAAA-forbidden from regulating in *Rowe*.

Second, it is inescapable that, "[w]hen employees must stop and take breaks, it takes longer to drive the same distance." *Campbell*, 2012 WL 2317233 at *4.

---

[13] *Appellants' Brief* at 47.

[14] *SRE* at 2 (lines 9-12) (emphasis in original).

Longer drive times necessarily mean "increasing the time it takes to complete a delivery," and thus also necessarily mean *less* service on the whole. *Cole*, 2012 WL 4479237 at \*4. Indeed, as the district court observed, Appellants never contested in the proceedings below that the duty-free break time of at least one hour and 30 minutes the California rules command, "by virtue of simple mathematics," reduces the amount of productive employee work time available to motor carriers and thus necessarily decreases the amount of service motor carriers can offer without increasing workforce and equipment. *RE* at 14. Certainly, a state law that demands *less* motor carrier service is a law that has a direct "connection with" service too.

Third, the break laws' insistence upon when and exactly for how long carriers provide breaks for their employees is "directly and significantly related to … the frequency and scheduling of transportation," *RE* at 15, and therefore cannot help but "relate to" customer service. As one court has acknowledged, there is in truth "no reason to conclude [a carrier] could feasibly comply with California's meal break laws *without* altering … services." *Esquivel*, 2012 WL 516094 at \*6 (emphasis supplied). Below, Appellants actually proved that point by their insistence that Penske should pre-schedule meal breaks into its dispatch system and simply suffer the consequences of each driver making one or two less deliveries per day. *RE* at 14; *SRE* at 50 (lines 25-28). Under Appellants' own reading of the

33

California break laws, therefore, motor carrier service must be *scheduled around* California-dictated breaks no matter if the *frequency* of customer deliveries is thereby reduced – a "related to-service" impact the FAAAA forbids. *See Charas*, 160 F.3d at 1265 ("'service' … refers to the frequency and scheduling of transportation").

Finally, absent application of the break laws, motor carrier service, in accordance with the FAAAA's "deregulatory and pre-emption related objectives," reflects "'maximum reliance on competitive market forces'" – as opposed to a service schedule dictated by California law. *Rowe*, 552 U.S. at 371. Under the FAAAA, the timing of motor carrier service (subject to the federal HOS Regulations) is to be decided by motor carriers and their customers based upon how best to serve the needs of the market, not by California's "direct substitution of its own governmental commands." *Id*. at 372. And, as the district court properly found, it is also "key" that, "to allow California to insist exactly when and for exactly how long carriers provide breaks for their employees would allow other States to do the same, and to do so differently," *RE* at 15, leading to just the sort of "patchwork of state service-determining laws, rules and regulations" the FAAAA forbids. *Rowe,* 552 U.S. at 373.

Notably, the trucking industry is already governed by the HOS Regulations that impose driver work hour rules uniformly-applied throughout the United States.

Those rules, which currently impose no break requirement, generally prohibit drivers from driving their trucks after 14 consecutive hours of coming on duty (a limitation that is *not* extended by any off-duty breaks taken during the day), restrict driving time to 11 hours during that 14-hour period, and then require 10 hours off duty before driving can begin again.  49 C.F.R. § 395.3(a).  While operating in California, however, Appellants insist motor carriers must also comply with California's break laws, which not only reduce a driver's on-duty work hours by at least one hour and 30 minutes each day,[15] but also dictate when breaks of specific duration must occur, and are thus significantly different from the HOS Regulations' requirements.[16]  And, if California is permitted such regulation, the

---

[15] Notably drivers perform numerous work activities, aside from driving, that are defined as "on-duty" time, including time spent waiting to be loaded, unloaded, or dispatched at any terminal or facility; performing pre-trip and post-trip vehicle inspections; fueling, servicing, or conditioning their vehicles; complying with drug-testing requirements; and all time spent performing any other work in the service of the motor carrier.  49 C.F.R. § 395.2.

[16] On December 27, 2011, the FMCSA published changes to the HOS Regulations, but generally postponed required carrier compliance with the changes until July 1, 2013.  *Hours of Service of Drivers*, 76 Fed. Reg. 81134 (Dec. 27, 2011), *petition for review pending, American Truck. Ass'ns v. Federal Motor Carrier Admin.*, No. 12-1092 (D.C. Cir.).  The newly-amended HOS Regulations, therefore, have no application to this case but in any event will still be far less restrictive than California law by requiring only a single 30-minute off-duty break that the driver may take at any time so long as he does not drive after eight consecutive hours on duty without a break.  49 C.F.R. § 395.3(a)(3)(ii) (effective July 1, 2013).  As described by the FMCSA, the new break provision "allows truckers to drive if they have had a break of at least 30 minutes, *at a time of their choosing*, sometime within the previous 8 hours," and thus "[d]rivers will have *great flexibility* in deciding when to take a break."  76 Fed. Reg. at 81134; 81136 (emphasis supplied)

35

floodgates would open for like-minded, yet different, additional regulation from other states too. It would be hard to imagine a better example of "patchwork" regulatory impact if motor carriers were required to modify their delivery schedules for each customer according to the particular nuances of each state's break laws depending on every driver's geographic location at any given time – all the while simultaneously juggling compliance with the HOS Regulations as well. The break laws, therefore, are just the kind of state-mandated service regulation the FAAAA preempts.

### 2.    The Break Laws Are Also Necessarily Linked to Routes

The California break rules, as applied to motor carriers like Penske, go even further than the service-impacting tobacco law struck down in *Rowe* because they are also inextricably linked to motor carrier routes as well. Understandably, Appellants make no effort to address what is perhaps the single-most incontrovertible fact in this case – that every driver sitting behind the wheel of a commercial motor vehicle when a pre-appointed California break time arises must *depart* from the route he is traveling to take the off-duty break period California

---

(noting driver who begins driving immediately after coming on duty may take his break any time between the third and eighth hour). A single 30-minute break with such built-in flexibility on timing, if and when it goes into effect, will inescapably conflict with the 5-stop, 1 hour and 30 minute duty-free break requirements of California law.

36

law demands.  The very command of the break laws as applied to truck drivers thus necessarily proves they are "related to" motor carrier routes.

No amount of "flexibility" built into the break laws, as Appellants portray them,[17] can change the fact that a driver may not simply click his heels and magically transport his truck off the highway and into a rest area or parking spot without physically maneuvering the vehicle off the highway (i.e., off its route), up or down an exit ramp (a different route), and along other roads (more different routes) leading to a safe and legal place at which to park – and then reverse the route-altering process over again when the break is completed.  It is of course true that not every driver may always be behind the wheel when a break period arises.  But not even Appellants can credibly claim that *no* truck will *ever* be on the road when "no later than the start of [his] sixth hour of work" or "after no more than 10 hours of work" the driver's first or second meal break entitlement arises, *Brinker*, 273 P.3d at 537-538, or that *no* driver would ever exit the highway for a 10-minute rest break "three and one-half to six hours" into his work day, or "six hours … to 10 hours" later, or "10 … to 14 hours" later again.  *Id*. at 529.

In a larger sense, though, Appellants also cannot seriously contend a solo truck driver is like a security guard, who simply calls upon another guard to relieve him and steps away from his post for a break, or an operating room nurse who

---

[17] *Appellants' Brief* at 43-44.

walks down the hall to a break room before or after surgery.[18]  No amount of pre-planning allows a truck driver to pull over to the side of the road, exit onto any seemingly-convenient street, or park anywhere at will for a break.  Instead, in deciding where and when to take any break, all professional truck drivers must account for – if nothing else – every motor vehicle safety law or regulation applicable to the area in which they are traveling, not to mention weather conditions, their own personal comfort and safety, and the safety of others traveling upon the roadways.[19]  Thus, as the district court and others have found, the duty-free breaks Appellants insist must be scheduled around motor carrier service are "related to" routes because they "impact the types and lengths of routes that are feasible" and "bind motor carriers to a smaller set of possible routes," *RE* at 14, essentially compelling carriers to "only use routes that are amenable to …

---

[18] *Appellants' Brief* at 45.

[19]  For example, California prohibits certain trucks from idling for more than 5 minutes at a time.  Cal. Code Regs. tit. 13, § 2485; *see also* 49 C.F.R. § 392.14 (imposing a duty on commercial motor vehicle operators to use "extreme caution" when hazardous weather conditions exist); 49 C.F.R. §§ 397.7; 397.69 (restricting the parking of and authorizing local restrictions on the routing of vehicles carrying hazardous materials); Cal. Veh. Code § 21718(a) (prohibiting stopping on the freeway except under limited circumstances, such as when a vehicle becomes disabled); Cal. Veh. Code §§ 22500; 22502 (restricting locations at which vehicles may be parked); Cal. Veh. Code § 22505 (authorizing state authorities to prohibit the stopping or parking of vehicles exceeding six feet in height in areas that would be "dangerous to those using the highway"); Cal. Veh. Code §§ 22507.5; 35701 (permitting local authorities to impose weight restrictions upon the parking – or use – of commercial vehicles on designated roadways).

scheduled breaks" and requiring drivers to "select routes that allow for the logistical requirements of stopping and breaking" as California law commands. *Campbell*, 2012 WL 2317233 at *4; *Cole*, 2012 WL 4479237 at *4. *Cf. Tillison v. Gregoire*, 424 F.3d 1093, 1100 (9th Cir. 2005) (law requiring public officials to authorize a public impound in writing made it "inconvenient" for public officials to request towing service, but "did not hinder the routes a tow truck operator may take" while traveling to the impound yard).

Nor, as Appellants suggest, may California's break requirements be simply waived off whenever they are inconvenient.[20] Wage Order No. 9 provides for no waiver of the rest break requirements at all, and Appellants neglect to fully describe the very limited circumstances under which a duty-free meal break may be waived. Under Wage Order No. 9, § 11(C), an on-duty meal period is permitted "*only* when the nature of the work prevents an employee from being relieved of *all* duty," only when the parties have agreed in advance to an on-the-job paid meal period by written agreement, and only then if the written agreement permits the employee "to revoke the agreement at *any* time." (Emphasis supplied). *See also* Cal. Lab. Code § 512(a) (prohibiting waiver of the second meal break in a 12-hour-or-more work day if the first meal break was waived). There is nothing "flexible"

---

[20] *Appellants' Brief* at 44. That suggestion, of course, is inherently inconsistent with Appellants' later contention that *taking* a break is vital to worker safety. *See Appellants' Brief* at 49-50.

about securing a written waiver conditioned upon such narrow circumstances – let alone one that is revocable "at any time," which makes any option for an on-duty meal break meaningless in practice and effect. *See also Esquivel,* 2012 WL 516094 at *6 (on-duty breaks permitted only when off-duty breaks are "virtually impossible" due to the nature of the work).

Finally, of course, nothing in the FAAAA limits preemption to only state laws "actually prescribing" the exact route upon which a motor carrier's trucks must travel. *Morales*, 504 U.S. at 385. It is more than enough that the break laws compel drivers to *change* the routes they would take but for application of the law's requirements. The district court rightly concluded, therefore, that the break laws are inescapably "related to" motor carrier routes and thereby FAAAA-preempted.

### 3.    The Break Laws Are Not "Wage" Laws That Produce Only An Indirect "Trickle Down" Effect on Service or Routes

The district court correctly rejected Appellants' effort to "mischaracterize" California's break laws as nothing other than a "wage" requirement incurred as a necessary cost of doing California business. *RE* at 16 n.6. As the court explained, the break laws – unlike a wage law – do not first increase labor costs and make motor carrier services "more expensive," but rather impose binding "substantive restrictions" on and are "significantly more connected to the routes and services of a motor carrier than laws that merely impact the cost of labor." *RE* at 19. It is in

40

any event a "faulty premise" that the break laws are "wage laws" at all. *Cole*, 2012 WL 4479237 at *6.

In this regard, the district court could hardly have better predicted the decision in *Kirby*, 274 P.3d 1160 (of which Appellants are apparently unaware), which settled the "wage laws" argument once and for all four months before Appellants filed their brief in this appeal. In that case, although it had previously labeled the one hour of premium pay required by Cal. Lab. Code § 226.7(b) as a "wage" in deciding what statute of limitations to apply to a break law claim, the California Supreme Court confirmed the pay requirement is unquestionably the *remedy* for a break law violation, not the state law requirement itself. *Kirby* thus categorically refutes Appellants' "wage law" argument as follows:

> [California Lab. Code §] 226.7 is *not aimed at protecting or providing employees' wages*. Instead, the statute is primarily concerned with … requiring that employers provide meal and rest periods … . When an employee sues for a violation of section 226.7, he is suing because an employer has allegedly "require[d] [the] employee to work during [a] meal or rest period mandated by an applicable order of the Industrial Welfare Commission." (§ 226.7, sub. (a)). In other words, a section 226.7 action is brought for the *nonprovision of meal and rest periods*, not for the "nonpayment of wages."

274 P.3d at 1167 (emphasis in original and supplied).[21]

---

[21] The defendant in *Kirby* was as much confused as Appellants by *Murphy v. Kenneth Cole Productions, Inc.*, 155 P.3d 284 (Cal. 2007) – the court's earlier-decided statute of limitations case – but the *Kirby* decision quickly resolved that problem as follows: "To say that a section 226.7 remedy is a wage … is not to say

*Kirby* also defeats Appellants' attempt to make use of an agency opinion letter suggesting an employer has an option to "'*choose* not to provide its employees with meal and rest periods, in which case [it] must simply pay the premium.'"[22]  To the contrary, *Kirby* says, Cal. Lab. Code § 226.7 "does *not* give employers a lawful choice between providing *either* meal and rest breaks *or* an additional hour of pay."  274 P.3d at 1256 (emphasis in original and supplied).  This is because paying an extra hour of premium pay (to "compensate" for a missed break of only 10 or 30 minutes) "does not excuse a section 226.7 violation" any more than paying compensatory damages excuses the violation of any other duty imposed by law.  *Id.*  In short, it is compliance with the California meal and rest break requirements that is the activity preempted by the FAAAA, and, if Penske cannot be made to comply under the FAAAA, it cannot be forced to pay the fine imposed for a break law violation either.  *See Esquivel*, 2012 WL 516094 at *6 (rejecting identical argument that defendant could "comply with California

---

that the *legal violation* triggering the remedy is nonpayment of wages."  274 P.3d at 1168 (emphasis in original).

[22] *Appellants' Brief* at 56 (emphasis supplied).  The cited opinion of the Division of Labor Standards Enforcement is not binding.  *Murphy*, 155 P.3d at 291 n.7.  More significantly, Appellants' argument that paying money for a missed break in lieu of providing one, as a matter of employer "choice," cannot be reconciled with their simultaneous conflicting contention that actually *taking* a break is crucial to worker safety.

law without significantly altering its routes, services, or prices by…paying drivers for an extra hour of work in lieu of providing scheduled breaks").[23]

Appellants' attempt to shoe horn the break laws into the "wage law" cases they cite is in any event unavailing. The break laws are conduct-regulating laws that, in the first instance, compel motor carriers to do things – to *stop* providing service at specified time intervals and to *change* their motor vehicle routes – that have nothing to do with how much an employee is paid. The break laws, therefore, are even more unlike a wage law than the Massachusetts tips law deemed ADA-preempted in *Difiore*, which prohibited employer deductions from tips or service charges and was "aimed at protecting employee compensation." 646 F.3d at 87. But just as the airline's modification of its curbside check-in fee to avoid liability in *Difiore* would have "require[d] changes in the way … service is performed," the command of California's break laws similarly "does more than simply regulate the employment relationship." *Id*. It instead "directly regulates how [motor carrier]

---

[23] A case upon which Appellants rely, *Cardenas v. McLane Foodservices, Inc.*, 796 F. Supp. 2d 1246 (C.D. Cal. 2011), is an example of a misinformed ruling in which the meal and rest break requirements were repeatedly mischaracterized as "wage laws" that, in the court's view, might merely cause the motor carrier to "*choose* to adjust its routes, or slightly modify its services." *Id*. at 1256 (emphasis supplied). Although it is unknown why the court found the motor carrier's evidence filed under seal to be "unconvincing and overly speculative," *id*. at 1256 n.4, it *is* known, as confirmed in *Kirby*, 274 P.3d at 1167, that the break laws are not "wage laws" at all. In addition, it is inexplicable how the court could have viewed the break laws as offering motor carriers *any* "choice" but to *stop* providing service altogether at the specified time intervals the laws command.

service is performed" – "not merely how [the motor carrier] behaves as an employer." *Id*. at 88.

In contrast, the non-preempted prevailing wage law addressed in *Californians for Safe & Competitive Dump Truck Trans. v. Mendonca*, 152 F.3d 1184 (9th Cir. 1998), *cert. denied*, 526 U.S. 1060 (1999), was a law that – by definition – *first* required the payment of a certain wage, and it was only because of that labor cost that the employer was able to construct a "trickle down" effect on prices and an alleged compulsion to "re-direct and re-route equipment to compensate for lost revenue." *Id*. at 1189. Penske has never argued – or needed to argue – that the break laws make the cost of California labor so expensive as to necessitate a compensating "trickle down" reduction in or change to service or routes. This is because the break laws, by their very command, *first* regulate service and routes themselves – which is "just what Congress did not want states regulating, whether at high cost or at low." *Difiore*, 646 F.3d at 88. In this respect, Penske agrees with the observation in *Air Transp. Ass'n of America v. City & Cnty. of San Francisco*, 266 F.3d 1064 (9th Cir. 2001) that the financial "leverage" exerted by state or local law is seldom the test for preemption. Instead, the test is whether carriers are left to "make their own decisions about where to fly" or whether the challenged law is using its "power to force [carriers] to adopt or change their prices, routes or services." *Id*. at 1074. The break laws, unlike the

non-preempted discrimination ordinance in *Air Transp. Ass'n*, do not survive that test because they of course *do* tell motor carriers both when and where "to fly" and unquestionably compel them to "change their … routes or services" too.[24]

Even revisiting the Supreme Court ERISA-limiting cases, inapplicable as they otherwise are under *Korean Air Lines*, 642 F.3d at 697, does not offer any weight to Appellants' "wage law" argument. Those decisions draw a distinction between state laws that have only an "indirect economic influence" making a course of action more or less "attractive" and other laws that instead "bind choices" and thus function as the very type of activity-regulating mandate Congress sought to forbid. *Travelers*, 514 U.S. at 659. A challenged surcharge on patient billings, therefore, has survived ERISA preemption because it bore only on "the cost of benefits" provided by an ERISA benefit plan. *Id.* at 660. Similarly, a

---

[24] Respectfully, Penske's only quarrel with *Air Transp. Ass'n* is its suggestion that a preempted connection with a route or service exists only if the challenged law binds a carrier "to a *particular* … route or service." *Id.* at 1072 (emphasis supplied). That phrasing, which was employed again in *American Truck. Ass'ns v. City of Los Angeles*, 660 F.3d 384, 397 (9th Cir. 2011) ("ATA II") as applicable to "borderline" cases and was important to the outcome in neither decision, is at odds with *Morales*, which ruled that the ADA's preemptive scope is not limited to only laws "actually prescribing" routes and services. 504 U.S. at 385. It is in any event doubtful this Court intended to use the word "particular" in the rigid fashion Appellants suggest given *Air Transp. Ass'n*'s summary of ERISA cases as calling for a "particular course of action" limitation. 266 F.3d at 1071. Binding a carrier to a "particular course of action" with respect to routes (forcing trucks to alter routes, for example) is a far cry from binding a truck to a "particular route" (such as limiting travel to only the Pacific Coast Highway), yet both state law compulsions should be equally FAAAA-preempted.

prevailing wage law was not ERISA-preempted in *Dillingham* because, while the law "alter[ed] incentives" with respect to benefit plans, it did not "dictate the choices" ERISA plans faced or, indeed, "bind [them] to anything." 519 U.S. at 332, 334. And, in *DeBuono*, the challenged gross receipts tax merely "increase[d] the cost of providing benefits" to the participants the ERISA plans served. 520 U.S. at 816.[25]

None of those results determines the question here. The break laws are not mere expense-imposing surcharges, wage requirements, or taxes that only as a consequence of their economic cost might influence motor carrier incentives to perform California services or operate on California routes. Instead, the break laws themselves "bind" motor carriers to a particular course of conduct in performing service (by commanding when *no* service may be performed or when service must be ceased) and "dictate choices" in motor carrier routes (by forcing

---

[25] This is not to say that a state law with a "cost-imposing" impact in the first instance could never be preempted. Both the Supreme Court and this Court recognize that state laws with economic effects so acute or exorbitant as to substantively compel conduct Congress did not want states regulating can and should be preempted. *DeBuono*, 520 U.S. at 816 n.16; *Travelers*, 514 U.S. at 664; *Air Transp. Ass'n*, 266 F.3d at 1075. Indeed, if it were the rule that cost-imposing laws could never be preempted – despite their inescapable "related to" impact on pricing – then the word "price" would be effectively written out of the "related to a price, route or service" language of the FAAAA.

trucks *off* their chosen routes to different routes). 519 U.S. at 332, 334. The break laws, therefore, are the very type of conduct-regulating laws the FAAAA forbids.[26]

Finally, for all of the above reasons, Appellants' "parade of horribles" is just not credible or relevant. They disingenuously suggest the FMCSA's decision rejecting a petition for administrative preemption under the HOS Regulations (not the FAAAA) supports their fears,[27] but that is simply not true. As is facially apparent from its ruling, the FMCSA's only concern was with reading its own statutorily-limited "on commercial motor vehicle safety" preemption authority too broadly lest it exceed the narrow power afforded it under 49 U.S.C. § 31141. 73 Fed. Reg. at 79205-79206 (*RE* at 92). The FAAAA's "related to" language, in contrast, does not so constrain this Court's authority, expressing as it does an "'expansive sweep'" "'conspicuous for its breadth.'" *Morales*, 504 U.S. at 384 (internal citations omitted). Beyond that, there is no reason to believe a

---

[26] That there is a cost component that makes the break laws related to prices too does not undermine this point. As Penske demonstrated in evidence presented to, but not considered by the district court, the break laws' impact upon motor carrier prices flows directly from their service and route regulation – i.e., the need to add additional workforce and equipment to make up for the service interruptions and lost productive work time the break laws cause – not from a wage or other cost-imposing expense demanded by California law. *SRE* at 35-38. In any event, because the FAAAA is written in the disjunctive, prohibiting state laws "related to a price, route *or* service of any motor carrier," a price-related preemption finding is unnecessary to an affirmance of the district court ruling. 49 U.S.C. § 14501(c)(1) (emphasis supplied).

[27] *Appellants' Brief* at 14-15; 41.

preemption finding here sweeps up trespass or environmental laws that have no more than a tenuous effect on motor carrier services or routes, assuming most courts will give each case careful judicious thought. *See California Dump Truck Owners*, 2012 WL 273162 at *8 (cautiously distinguishing between the break laws' "no service" mandate and the non-preempted environmental law claim advanced).[28]    And, as the district court rightly concluded, its ruling does not "embark down a slippery slope that would drag in nearly every state labor laws as applied to motor carriers" either. *RE* at 18.  *Only* state laws that actually "relate to" motor carrier services and routes in a break law-like way are ensnared by the FAAAA's preemptive net, and, because this case does not even come close to presenting a "borderline question" on whether the break laws are so "related," just where to "draw the line" on preemption in other settings is appropriately left for another day and case. *Morales*, 504 U.S. at 390 (internal quotations omitted).

### C.    The *Motor Vehicle* Safety Exception Does Not Apply

As the district court ruling and others confirm, Appellants' "safety" argument does not save the break rules from preemption. *RE* at 19-21; *see also Cole*, 2012 WL 4479237 at *6; *Cardenas*, 796 F. Supp. 2d at 1256-1258.  The

---

[28] *Cf. Fitz-Gerald v. SkyWest Airlines, Inc.*, 65 Cal. Rptr. 3d 913, 921-922 (Cal. Ct. App. 2007) (three-sentence analysis rejecting ADA preemption of minimum wage claims and break law claims considered as if they were one and the same). Appellants' remaining examples of laws that might be preempted (*e.g.*, speeding) are expressly excepted from FAAAA preemption because, unlike the break laws, they *actually* regulate motor vehicle safety.

language at issue is the FAAA's limited saving clause in which Congress decided the FAAAA should not "restrict the safety regulatory authority of a State *with respect to motor vehicles*."    49 U.S.C. § 14501(c)(2)(A) (emphasis supplied). Appellants, after attempting to read a "police power" exception *into* the FAAAA's saving clause, now seek to read the words "with respect to motor vehicles" right *out* of it.

This Court has rightly described the preemption exception under 49 U.S.C. § 14501(c)(2)(A) as applicable only to state regulation that is "intended to be, and is, genuinely responsive to *motor vehicle* safety." *ATA I*, 559 F.3d at 1055 (emphasis supplied) (relying upon *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 442 (2002)).  First and foremost, the excepted regulation must be "with respect to motor vehicles," meaning the exception does not "preserve the state's authority over safety issues generally" and instead very specifically "addresses *the regulation of motor vehicles*." *United Parcel Serv., Inc. v. Flores-Galarza*, 385 F.3d 9, 13-14 (1st Cir. 2004) (emphasis supplied), *cited with approval in ATA I,* 559 F.3d at 1054.  The break laws do not meet that threshold requirement.

There is nothing in Cal. Lab. Code §§ 226.7; 512 – applicable as they are to the generic "employer" and its employees – that "addresses the regulation of motor vehicles" in any way.  *United Parcel Serv.,* 385 F.3d at 14.  In this respect, the

49

decision in *Murphy*, 155 P.3d 284, does nothing to support Appellants' position. The generalized notion of "safety" expressed in *Murphy* advanced the court's view of the break laws as a "remedial worker protection framework" "[c]oncerned with the health and welfare of employees" generally, *id.* at 291, but *Murphy* of course says nothing about whether the break rules were intended to be and are in fact genuinely responsive to *motor vehicle safety*. Nor could it, given that (to use Appellants' own words) the break laws were not "written with the [trucking] industry in mind" and are "virtually identical" across "hundreds of different industries,"[29] many of which never employ workers who sit behind the wheel of any vehicle. That the IWC's wage orders apply the meal and rest break requirements equally to beauticians and barbers in the personal service industry, workers in the canning and freezing industry, and technical and clerical workers alike (among untold numbers of other California workers) is sufficient in and of itself to rebut any notion that the break laws were ever intended to have any remote connection to motor vehicle safety. Cal. Code Regs. tit. 8, §§ 11020; 11030; 11040; *see also generally* Cal Code Regs. tit. 8, §§ 11010-11170.[30]

---

[29] *Appellants' Brief* at 7; 35 (internal quotations omitted).

[30] Appellants, in arguing the various wage orders simply evidence "mixed motives" under *ATA II*, 660 F.3d at 405, stretch the Court's meaning of that phrase beyond recognition. The laws in question in *ATA II* (and in *Tillison*, 424 F.3d 1093, too) took direct aim *only* at motor vehicle operation itself – not at virtually every commercial activity in the state, some of which might just happen to use a motor vehicle.

Nor does a single wage order out of 17 directed to the "transportation industry" show the break laws were intended to address motor vehicle regulation at all, let alone commercial motor vehicle safety. Wage Order No. 9 applies not just to motor carriers, but also to "rail," "air," and "water" carriers too whether they operate motor vehicles or not. *Wage Order No. 9*, § 2(N). And it also applies to all transportation workers other than administrative, executive, or professional personnel – *not* just to drivers – including warehouse workers and those who clean vehicles as well. *Wage Order No. 9,*§§ 1(A); 2(N). So, whatever vehicle safety arguments the IWC may have considered in adding previously-exempted public transit drivers into the mix in 2004[31] – an exemption in and of itself inconsistent with an order supposedly aimed at motor vehicle safety – Wage Order No. 9 itself evidences nothing other than the same general purpose to promote the health and welfare of all break law-covered workers whether they push a broom, carry a food tray, or operate nothing other than a pen or pencil all day.

It is unsurprising, therefore, that the *Cardenas* case upon which Appellants otherwise rely could find no evidence in the break laws' legislative history even "suggesting that the *purpose* of the laws was to promote motor vehicle safety." 796 F. Supp. 2d at 1257 (emphasis in original). It is likewise no surprise that the FMCSA, in the petition for administrative preemption upon which Appellants also

---

[31] *See Appellants' Brief* at 49-50.

otherwise rely, found the break laws could not in any way be viewed as regulations "on commercial motor vehicle safety" because they "are not even unique to transportation." 73 Fed. Reg. at 79205-79206 (*RE* at 92). The district court thus rightly concluded the break laws are responsive only to "general public health concerns" and are therefore not saved from FAAAA preemption. *RE* at 19. Consistent with the rule that a preemption law's saving clause cannot be construed to destroy the law itself, *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1748 (2011), the point made in *ATA I* is accordingly dispositive here: "[E]ven if some kind of general public health concerns are (or may be) involved … that alone does not bring [state] regulation within the ambit of the motor vehicle safety exception" – otherwise, "the exception would swallow the preemption section itself or, at the very least, cut a very wide swath through it." 559 F.3d at 1054, *cited in Cardenas*, 796 F. Supp. 2d at 1258; *see also* Cole, 2012 WL 447237 at *6 ("[t]o hold otherwise would allow the motor vehicle safety exemption to swallow the preemption section of the rule"). Because the break laws are not in any sense imposed as safety regulation "with respect to motor vehicles," the FAAAA's *motor vehicle* safety exception does not apply.

## VIII. CONCLUSION

Just as federal law preempted "state efforts to regulate … the advertising *about* carrier … services at issue in *Morales*" and just as it preempted "Maine's

efforts to regulate [the *type* of] carrier delivery services themselves" in *Rowe*, federal law also preempts California's efforts to regulate *when* carrier services may be performed (and when they must cease being performed) and to thereby dictate changes in carrier routes as well. *Rowe*, 552 U.S. at 372. For all the foregoing reasons, Penske respectfully requests the Court for an order affirming the district court's decision in all of its respects.

Respectfully submitted,

/s/ James H. Hanson
James H. Hanson
Attorney for Appellees,
Penske Logistics, LLC and
Penske Truck Leasing Co., L.P.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,573 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Times New Roman font.

/s/ James H. Hanson
James H. Hanson

November 9, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2012, I electronically filed the Appellees' Brief with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ James H. Hanson
James H. Hanson