No. 12-55705

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

MICKEY LEE DILTS, ET AL.,

*Plaintiffs-Appellants,*

vs.

PENSKE LOGISTICS, LLC AND PENSKE TRUCK LEASING CO., LP,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of California
No. 3:08-cv-00318-CAB

## BRIEF OF AMERICAN TRUCKING ASSOCIATIONS, INC.
## CALIFORNIA TRUCKING ASSOCIATION,
## AND TRUCKLOAD CARRIERS ASSOCIATION
## AS AMICI CURIAE IN SUPPORT OF APPELLEES'
## PETITION FOR REHEARING EN BANC

R. Eddie Wayland
King & Ballow
315 Union Street, Ste. 1100
Nashville, TN 37201

*Attorney for Amicus Truckload
Carriers Association*

Richard Pianka
ATA Litigation Center
Prasad Sharma
American Trucking Associations, Inc.
950 N. Glebe Road
Arlington, Virginia 22203
Telephone: (703) 838-1889
Facsimile: (703) 838-1705
rpianka@trucking.org

*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for American Trucking Associations, Inc., (ATA), California Trucking Association (CTA), and Truckload Carriers Association (TCA) certifies that each has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................ii

IDENTITY AND INTEREST OF AMICI CURIAE ..................................1

ARGUMENT ......................................................................................3

   A. En Banc Review Is Necessary to Bring This Court's FAAAA Juris-
      prudence in Line with Supreme Court Precedent...........................3

   B. The Panel's Decision Will Have Serious Adverse Consequences.. 10

CONCLUSION ...................................................................................19

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Air Transport Association of America v. City & County of San Francisco*, 266 F.3d 1064 (9th Cir. 2001) ....................................................... 5, 6

*American Airlines, Inc. v. Wolens*,
513 U.S. 219 (1995) .......................................................................... 7, 8

*American Trucking Associations, Inc. v. City of Los Angeles*,
133 S. Ct. 2096 (2013) ........................................................................ 5

*American Trucking Associations, Inc. v. City of Los Angeles*,
660 F.3d 384 (9th Cir. 2011) .................................................. 4, 5, 7, 14

*Angeles v. US Airways, Inc.*,
2013 U.S. Dist. LEXIS 22423 (N.D. Cal. Feb. 19, 2013) .................... 18

*Bickley v. Schneider National Carriers, Inc.*,
2013 U.S. Dist. LEXIS 8636 (N.D. Cal. Jan. 22, 2013) ...................... 11

*Blackwell v. Skywest Airlines*, Inc.,
2008 U.S. Dist. LEXIS 97955 (S.D. Cal. Dec. 3, 2008) ...................... 18

*Brinker Rest. Corp. v. Superior Court*,
273 P.3d 513 (Cal. 2012) .................................................................... 14

*Esquivel v. Vistar Corp.*,
2012 U.S. Dist. LEXIS 26686 (C.D. Cal. Feb. 8, 2012) ...................... 13

*Ginsberg v. Northwest, Inc.*,
695 F.3d 873 (9th Cir. 2012) ............................................................. 5, 6

*Helde v. Knight Transportation, Inc.*,
982 F. Supp. 2d 1189 (W.D. Wash. 2012) ........................................... 11

# TABLE OF AUTHORITIES
### (continued)

Pages(s)

*Miller v. Southwest Airlines, Co.*,
  923 F. Supp. 2d 1206 (N.D. Cal. 2013) ................................................ 18

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) ....................................................... 3, 4, 6, 7, 8, 15

*Northwest, Inc. v. Ginsberg*,
  134 S. Ct. 1422 (2014) ............................................................ 5, 8, 9, 10

*Ramirez v. United Rentals, Inc.*,
  2014 U.S. Dist. LEXIS 101259 (N.D. Cal. July 11, 2014) .................. 11

*Rowe v. N.H. Motor Transport Association*,
  552 U.S. 364 (2008) ................................................................... 3, 11, 15

## Statutes, Regulations, and Rules

49 U.S.C. 14501(c)(1) ........................................................................ 3, 17

49 U.S.C. 41713(b)(1) ........................................................................... 3

Motor Carrier Act of 1980,
  Pub. L. No. 96-296, 94 Stat. 793 ...................................................... 11

## Other Authorities

49 C.F.R. § 395.3(a)(1)-(3)(i) .................................................................. 12

49 C.F.R. § 395.3(a)(3)(ii) ...................................................................... 12

49 C.F.R. § 395.3(b) ............................................................................... 12

H.R. Conf. Rep. No. 103-677 (1994) .................................................. 3, 11

## IDENTITY AND INTEREST OF AMICI CURIAE [*]

American Trucking Associations, Inc., (ATA) is the national association of the trucking industry, comprising motor carriers, state trucking associations, and national trucking conferences, and was created to promote and protect the interests of the national trucking industry. Its direct membership includes approximately 2,000 trucking companies and industry suppliers of equipment and services; and in conjunction with its affiliated organizations, ATA represents over 30,000 companies of every size, type, and class of motor carrier operation. ATA regularly represents the common interests of the trucking industry in courts throughout the nation, including on numerous occasions before this Court.

The California Trucking Association (CTA) has over 1,500 members who operate over 350,000 trucks in California. CTA's members transport 85 percent of the shipments that travel on California's highways each day, from self-employed independent contractors (or owner-

---

[*] Both parties have consented to the filing of this amicus brief. *See* Fed. R. App. P. 29(a). No counsel for either party authored this brief in whole or in part, and no party, party's counsel, or person other than the amici, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(c)(5).

-1-

operators) to large international motor carriers employing thousands of truck drivers. CTA has been serving the businesses that operate trucks in California for over seventy-five years. Over the years that CTA has represented trucking enterprises in California, it has acquired knowledge and information about the practices and policies that regulate and affect this industry.

Truckload Carriers Association (TCA) is a national trade association created to protect and promote the interests of the truckload segment of the motor carrier industry. TCA represents dry van, refrigerated, flatbed, and intermodal container carriers operating in the 48 contiguous states, as well as in Alaska, Canada, and Mexico. The association draws on more than 75 years of experience to serve the interests of its truckload members.

Amici and their members have a strong interest in ensuring that Congressional policy establishing a deregulated trucking industry is not undermined by a patchwork of state-level impediments to the safe and efficient flow of commerce. Moreover, ATA has special familiarity with the issue of preemption under the Federal Aviation Administration Authorization Act (FAAAA) raised in this case because it actively partici-

pated in the formulation of federal motor carrier deregulation policy in Congress. *See* H.R. Conf. Rep. No. 103-677, at 88 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715, 1760. Since that time, ATA has been involved (either as a party or an amicus) in many of the decisions of this Court and the Supreme Court interpreting and applying the FAAAA's preemption provision.

## ARGUMENT

### A. En Banc Review Is Necessary to Bring This Court's FAAAA Jurisprudence in Line with Supreme Court Precedent.

When it passed the Federal Aviation Administration Authorization Act (FAAAA) in 1994, Congress prohibited states from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier." 49 U.S.C. 14501(c)(1). As the Supreme Court has repeatedly explained, this preemption provision—and the materially equivalent preemption provision of the Airline Deregulation Act (ADA), 49 U.S.C. 41713(b)(1)—was intended by Congress to be broad in scope, reaching any measure whose effect on a carrier's prices, routes, or services is not "tenuous, remote, or peripheral." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 375 (2008). *See also*, *e.g.*, *Morales v. Trans World Airlines*,

*Inc.*, 504 U.S. 374, 383 (1992) (explaining that the words of the ADA's preemption provision "express a broad pre-emptive purpose").

But in reaching the conclusion that California's meal and rest break requirements are not preempted by the FAAAA, the panel did not inquire whether their effect on carrier routes and services was merely "tenuous, remote, or peripheral." Instead, the panel relied on this Court's earlier cases providing that, when a state law "does not refer directly to rates, routes, or services, 'the proper inquiry is whether the provision * * * *binds* the carrier to a particular price, route or service.'" Slip op. 15, quoting *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 660 F.3d 384, 397 (9th Cir. 2011) (emphasis in original). That analysis—which no other circuit has adopted—fails to give full effect to Congress's command, and cannot be squared with the Supreme Court's consistent instructions regarding FAAAA preemption. Because the panel considered itself bound by earlier circuit cases establishing that inadequate analysis, Slip op. 14, en banc review is necessary to reconcile this Court's cases with the language of the statute and with Supreme Court precedent.

1. The analysis employed by the panel here originated in this Court's

-4-

decision in *Air Transport Association of America v. City & County of San Francisco*, 266 F.3d 1064 (9th Cir. 2001). There, a divided panel held that, under the materially identical preemption provision of the ADA, "a local law will have a prohibited connection with a price, route or service if the law *binds* the air carrier to *a particular price, route or service*." *Id.* at 1072 (emphases added).

The Court later applied the same test to a preemption challenge under the FAAAA, in *American Trucking Associations, Inc. v. City of Los Angeles*, 660 F.3d 384 (9th Cir. 2011), *rev'd in part*, 133 S. Ct. 2096 (2013). A divided panel held that in a so-called "borderline" case—*i.e.*, "when a State does not directly regulate (or even specifically reference) rates, routes, or services"—"the proper inquiry is whether the provision, directly or indirectly, 'binds the . . . carrier to a particular price, route or service.'" *Id.* at 396-97 (quoting *Air Transport Ass'n*, 266 F.3d at 1072).

Most recently (prior to the present case), a panel of this Court employed effectively the same standard in *Ginsberg v. Northwest, Inc.*, 695 F.3d 873 (9th Cir. 2012), *rev'd sub nom. Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422 (2014). *Northwest* involved a common-law claim against the airline for breach of the implied covenant of good faith and fair deal-

ing in terminating the plaintiff from its frequent-flier program. Relying on *Air Transport Association*, this Court held that the claim was not preempted because "enforcement of the covenant is not 'to force the Airlines to *adopt or change* their prices, routes or services—the prerequisite for ADA preemption.'" *Id.* at 880 (quoting *Air Transport Ass'n*, 266 F.3d at 1074) (emphasis added).

2. The "binding" test first articulated in *Air Transport Association* (and at the heart of the decision in this case) was never a sound approach to preemption under the FAAAA. For one thing, the language of the test is patently narrower than the "expansive" language of the statute, *Morales*, 504 U.S. at 384: laws that *bind* a carrier to a *particular* price, route or service will necessarily be a small subset of laws that—in the language of the statute—*relate to* a carrier's price, route, and service. The "binding" test, on its face, fails to give full effect to the language of the statute. The Supreme Court long ago rejected the contention that the ADA "only pre-empts the States from *actually prescribing* rates, routes, or services," because that would "simply read[] the words 'relating to' out of the statute." *Morales*, 504 U.S. at 385 (emphasis added).

Moreover, as a matter of simple logic, the "binding" test, as articulated and applied by the panel in this case, is all but impossible to satisfy. The Court employs the test in cases where the challenged law "does not directly regulate (or even specifically reference) rates, routes, or services." *Am. Trucking Ass'ns*, 66 F.3d at 396. But it is difficult to imagine how a law that does not so much as *reference* rates, routes, or services could, at the same time, bind a carrier to a *particular* rate, route, or service. By employing a no-win test to preemption challenges based on indirect effects, this Court's precedents have effectively limited the scope of FAAAA and ADA preemption to laws with a *direct* effect on prices, routes, and services. That, in turn, insulates laws of general applicability—whose effects on motor carrier prices, routes and services will predictably be indirect—from FAAAA and ADA preemption. The Supreme Court has foreclosed precisely this outcome, because "there is little reason why state impairment of the federal scheme should be deemed acceptable so long as it is effected by the particularized application of a general statute." *Morales*, 504 U.S. at 386 (holding that the ADA preempts claims under generally-applicable state consumer protection law). *See also Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 228

-7-

(1995) (ADA preempts claims under generally-applicable Illinois Consumer Fraud Act); *Northwest*, 134 S. Ct. at 1433 (ADA preempts claims for breach of generally-applicable common law covenant of good faith and fair dealing).

**3.** If there were any doubt about the viability of this Court's "binding" test, the Supreme Court's recent decision in *Northwest v. Ginsberg* put it decisively to rest. In that decision—issued a month after oral argument in *Dilts v. Penske*—a unanimous Supreme Court began by specifically noting that this Court's decision in *Northwest* had "[r]el[ied] on pre-*Wolens* Circuit precedent" for the proposition that a state law is not preempted if it "does not 'force the Airlines to adopt or change their prices, routes or services.'" 134 S. Ct. at 1428 (quoting 695 F.3d at 880). Instead, the Supreme Court held, the proper inquiry to determine whether a particular state law "relates to" "rates, routes, or services" is simply whether "it has 'a connection with, or reference to, airline' prices, routes, or services.'" *Id.* at 1430 (quoting *Morales*, 504 U.S. at 384). All nine Justices of the Supreme Court agreed that the claim for breach of the implied covenant of good faith and fair dealing necessarily had such a connection, simply because the frequent flyer program in question re-

lated to rates by awarding mileage credits that could be redeemed for tickets or upgrades. *Id.* at 1431.

It is impossible to square the continued viability of the "binding" test employed by the panel in this case with the Supreme Court's opinion in *Northwest*, much less with its result. As noted above, that opinion recited—but did not embrace—the similar test this Court employed in *Northwest*. If, as the Supreme Court held, the preemption question does not turn on whether the challenged law "force[s] the Airlines to adopt or change their prices, routes or services" generally, 134 S. Ct. at 1428, neither can it turn on whether the challenged law "binds" a carrier to a "particular" price, route, or service.

More importantly, applying the Ninth Circuit's "binding" test in *Northwest* would inevitably have produced an outcome directly contrary to the result the Supreme Court reached. The common-law implied covenant of good faith and fair dealing of course "does not refer directly to rates, routes, or services." Slip. op. 15. Under the Ninth Circuit analysis, then, "the proper inquiry becomes whether the provision, directly or indirectly, *binds* the carrier to a particular price, route or service." *Ibid.* But there was no suggestion in *Northwest* that the implied covenant

would have *bound* the airline to a *particular* price or service. Nevertheless, the Supreme Court had no difficulty unanimously holding that the claim was sufficiently connected to the airline's prices and services to trigger preemption. *Northwest*, 134 S. Ct. at 1431.

In short, *Northwest* precludes the continued viability of the "binding" test that led to the outcome in this case. En banc review is thus warranted to bring this Circuit's FAAAA/ADA jurisprudence in line with Supreme Court precedent.

## B. The Panel's Decision Will Have Serious Adverse Consequences.

The exceptional importance of this recurring issue further warrants en banc review. The panel's decision will not merely have serious adverse consequences on motor carrier operations nationwide—to say nothing of the shippers and consumers who rely on the trucking industry's services every day. It will also interfere with the Congressional policy—reflected in the FAAAA—favoring market-driven efficiency, under a uniform federal regulatory regime, in the interstate trucking industry.[1]

---

[1]  The recurrence of this issue is indisputable: the panel decision itself lists a dozen decisions involving FAAAA preemption of California break requirements since the district court's decision in this case. Slip op. 5-6 n.1. In addition, at least one other case turning on this issue was stayed (cont'd)

1. The FAAAA's preemption provision reflects Congress's determination to leave decisions concerning their prices, routes, and services, "where federally unregulated, to the competitive marketplace." *Rowe*, 552 U.S. at 373. Congress recognized that, even after largely deregulating the trucking industry at the federal level with the Motor Carrier Act of 1980, Pub. L. No. 96-296, 94 Stat. 793, "[t]he sheer diversity of [state] regulatory schemes [remained] a huge problem for national and regional carriers attempting to conduct *a standard way of doing business*." H.R. Conf. Rep. No. 103-677, at 87 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715, 1759 (emphasis added). It passed the FAAAA to ensure that motor carriers could implement efficient, standard business practices nationwide, subject to a set of uniform federal regulations focused on highway safety and driver welfare.

At Congress's instruction, the Federal Motor Carrier Safety Admin-

---

pending this Court's resolution of *Dilts* (*Bickley v. Schneider Nat'l Carriers, Inc.*, 2013 U.S. Dist. LEXIS 8636 (N.D. Cal. Jan. 22, 2013)), and the issue has already recurred in at least one California case decided since the panel's opinion (*Ramirez v. United Rentals, Inc.*, 2014 U.S. Dist. LEXIS 101259 (N.D. Cal. July 11, 2014)). Nor is the issue specific to California. *See, e.g., Helde v. Knight Transp., Inc.*, 982 F. Supp. 2d 1189, 1196 (W.D. Wash. 2012) (holding that FAAAA preempts Washington state break requirements).

istration (FMCSA) has promulgated hours-of-service regulations governing commercial truck drivers. Under those regulations, most drivers are permitted to drive up to 11 hours per day, within a 14-hour duty window, after which they must remain off-duty for at least 10 hours. 49 C.F.R. § 395.3(a)(1)-(3)(i) In addition, drivers are required to take a 30-minute off-duty break within 8 hours of going on duty, *id.* § 395.3(a)(3)(ii), and are subject to cumulative weekly driving limits, *id.* § 395.3(b). The panel's decision gives states the green light to impose another, state-by-state layer on top of these uniform hours-of-service rules, and in doing so inevitably restricts the services a motor carrier can provide, and the routes it can travel.[2]

**2.** To take one simplified (but by no means unrealistic) example: suppose a shipper has a load ready for pickup at 9:00 a.m. at point A, and needs it delivered to point B—six hours away—no later than 3:30 p.m. Under the federal hours-of-service regulations, a motor carrier could comfortably offer to provide that service. If the carrier were further subject to California's break rules, however, it could not. The driver

---

[2]  As we discuss below, the decision also invites a patchwork of state-by-state regulation that would defeat Congress's deregulatory intent. *See* Section B.3, *infra*.

would have to be provided with both a 10-minute and a 30-minute off-duty break during that 6-and-a-half hour delivery window. Even setting aside the time necessary to pull the truck off the road to a safe rest area, and then to get back on the road (which could easily add 10 or more minutes to each end of each break), that would render the service impossible to provide.[3] It is for reasons like this that then-District Judge Nguyen got it precisely correct when she could find "no reason to conclude that Defendant could feasibly comply with California's meal break laws without altering routes or services." *Esquivel v. Vistar Corp.*, 2012 U.S. Dist. LEXIS 26686, at *18 (C.D. Cal. Feb. 8, 2012).

**a.** The panel dismissed concerns of this nature by asserting that carriers could simply "hire additional drivers or reallocate resources in order to maintain a particular service level." Slip op. 20. Presumably, in the example above, the panel would suggest that carriers could provide the service in question simply by staffing the truck with two drivers instead of one. Not so. For one thing, it ignores California's requirement

---

[3] A similar example illustrating the effect on a carrier's routes is simple to construct in light of the fact that heavy trucks cannot simply pull to the side of any road in order for the driver to take a break, and not all roads are equipped with adequate rest-stop facilities to accommodate the break requirements of California law without re-routing and consequent re-scheduling.

that employees be free to leave the premises during a break. *Brinker Rest. Corp. v. Superior Court*, 273 P.3d 513, 533-34 (Cal. 2012). Thus, even if a hypothetical pair of drivers could swap places behind the wheel quickly enough, without compromising safety, to still be able to reach the destination within the specified window, California law would not be satisfied. For another, it overlooks the fact that *doubling* the labor costs of a service—particularly in a low-margin industry like trucking—will in many cases mean not providing the service at all. *See Am. Trucking Ass'ns*, 660 F.3d at 399 (state laws preempted if they "*impose costs* that compel the carrier to change rates, routes, or services" (emphasis added)).

**b.** More fundamentally, however, even if the panel's approach could succeed as a practical matter, the very suggestion that carriers can comply with California's break requirements by radically altering their operations in order to (in this example) offer a particular service underscores the fact that those requirements palpably "relate to" a carrier's services. In this example, even if adding a second driver were a genuine solution to the problem, California's rules would transform a one-driver service (under uniform federal regulations) into a two-driver service.

Not only would this "relate" to services in a way that could not seriously be characterized as merely "tenuous, remote, or peripheral," *Rowe*, 552 U.S. at 375, it would do so in a way that directly impeded the FAAAA's goal of promoting efficiency through uniformity. And it would substitute the state's "own governmental commands for 'competitive market forces' in determining * * * the services that motor carriers will provide." *Id.* at 372 (quoting *Morales*, 504 U.S. at 378).

**3.** The magnitude of the panel decision's impact is multiplied in that it allows *any* state to impose its break requirements on motor carrier operations. The inevitable result—for an industry that regularly crosses state lines—is a "state regulatory patchwork" that "is inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace." *Rowe*, 552 U.S. at 373. While the panel did recognize that the FAAAA's "principal purpose" is to prevent patchworks of state-specific laws, Slip op. 12, its dismissal of that concern in this case was predicated on its erroneous conclusion that the break requirements did not relate to prices, routes, or services in the first place, *id.* at 18-19.

**a.** Indeed, the United States—in the amicus brief filed by DOJ and

DOT at the panel's invitation (Dkt. 58)—recognized that a sweeping rejection of FAAAA preemption in this context would lead to just such an impermissible patchwork. To be sure, the government's brief urged the panel to reverse the district court's holding in favor of FAAAA preemption here. That recommendation, however, was rooted in the government's understanding of the particular facts of the case—specifically, the government's belief that the case involved only "short-haul drivers who . . . make frequent stops during the course of their ordinary work day." Dkt. 58 at 11. Under those circumstances, the government argued, drivers "could presumably take a break before or after one of [their] many scheduled stops," thus attenuating the effect of the break requirements on the carriers' operations. *Id.* at 22.

But the government cautioned that "preemption might be established in other contexts." Dkt. 58 at 24. To illustrate its point, the government offered as an example that in an interstate context "[a] carrier's obligation to track and comply with a patchwork of disparate state law [break] requirements would arguably impose *precisely the type of burden* on routes and services *that Congress sought to avoid* when it deregulated the motor carrier industry." *Id.* at 24-25 (emphases added).

**b.** Despite placing considerable weight on the government's brief, Slip op. 23-24, the panel's decision leaves no room for such distinctions. To the contrary, the panel made it expressly clear that its holding is *not* tied to the purported short-haul nature of these drivers' work: After holding that state rest break requirements do not contribute to an impermissible patchwork because they do not relate to prices, routes, or services at all, the panel observed merely that "Defendants *in particular* are not confronted with a 'patchwork'" insofar as they "work on short-haul routes and work exclusively within the state of California." Slip op. 19 n.2 (emphasis in original).[4]

**4.** Finally, given the Supreme Court's materially identical interpretation of the preemption provisions of the FAAAA and ADA, the panel's decision means that airlines, too, must meet the requirements of state meal and rest break laws—contrary to the decisions of the few lower

---

[4]    To be clear, amici do not agree with the government's parsing of the preemptive effect of the FAAAA based on type of carrier operation, which cannot be squared with the statute's preemption of state laws that relate to the prices, routes, or services of "*any* motor carrier." 49 U.S.C. 14501(c)(1) (emphasis added). Nor do we agree that the burdens the government recognizes in other contexts are not present in this case. Our point here is simply to illustrate that the panel's narrow approach to FAAAA preemption far outpaces even the government's excessively constricted view.

courts to have addressed that issue; *see Miller v. Southwest Airlines, Co.*, 923 F. Supp. 2d 1206, 1213 (N.D. Cal. 2013) (ADA preempts operation agent's California break claims); *Blackwell v. Skywest Airlines, Inc.*, 2008 U.S. Dist. LEXIS 97955, at *49-*54 (S.D. Cal. Dec. 3, 2008) (ADA preempts customer service representative's California break claims); *Angeles v. US Airways, Inc.*, 2013 U.S. Dist. LEXIS 22423, at *26 (N.D. Cal. Feb. 19, 2013) (ADA preempts ramp agents' California break claims).[5] If the panel's reasoning were correct, after all, airlines could "hire additional" pilots, cabin crew, and ground personnel, "or reallocate resources in order to maintain a particular service level" just as the panel suggests motor carriers do. Slip op. 20. The panel's decision, therefore, will directly affect not just the trucking industry (and, indirectly, shippers and consumers), but the airline industry (and its passengers) as well, making en banc review all the more warranted.

---

[5]  Although the government has never before, to ATA's knowledge, advocated different approaches to preemption under the ADA and FAAAA, in their brief in this case they suggest that "the preemption analysis would differ significantly if the state law were applied to airline employees." Dkt. 58 at 25. This would be so, the government argues, because "unlike motor carriers, an airline cannot readily interrupt tightly scheduled flight operations to accommodate state-mandated rest breaks for its staff." *Ibid.* But this conclusory assertion rests on the false assumptions that motor carrier operations are not tightly scheduled, and that they can be readily interrupted without disruption.

## CONCLUSION

The petition for rehearing en banc should be granted.


Dated:  August 18, 2014                Respectfully submitted,

                                       /s/ Richard Pianka
                                       _____
                                       Richard Pianka
                                       ATA Litigation Center
                                       Prasad Sharma
                                       American Trucking Associations, Inc.
                                       950 N. Glebe Road
                                       Arlington, Virginia 22203
                                       (703) 838-1889

                                       *Attorneys for Amici Curiae*

                                       R. Eddie Wayland
                                       King & Ballow
                                       315 Union Street, Ste. 1100
                                       Nashville, TN 37201

                                       *Attorney for Amicus Truckload
                                       Carriers Association*

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## FED. R. APP. P. 32(A)(7)(C)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 29-2(c)(2) because this brief contains 3,870 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century font.

DATED: August 18, 2014

/s/ Richard Pianka
Richard Pianka
*Attorney for Amici Curiae*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 18th day of August 2014, I electronically filed the foregoing brief with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

DATED: August 18, 2014

<u>/s/ Richard Pianka</u>
Richard Pianka
*Attorney for Amici Curiae*